UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS IWANSKI, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>vs.<br><br>FIRST PENN-PACIFIC LIFE INSURANCE COMPANY,<br><br>            Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Thomas Iwanski ("plaintiff"), and on behalf of himself and all others similarly situated, for his Complaint against defendant First Penn-Pacific Life Insurance Company ("First Penn"), states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by First Penn. Plaintiff seeks to represent a class of First Penn policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by First Penn.

2. The plaintiff, along with numerous other First Penn policyholders, has been forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts. The subject First Penn policies specify that monthly cost of insurance ("COI") rates "will be determined by us based on our expectations as to future mortality experience"– and nothing else. First Penn also contractually promised to determine the cost of insurance on a monthly basis.

1

3.      These policy provisions created a mutual and reciprocal commitment between First Penn and all class members: policyholders agree to let First Penn increase COI rates if expectations as to future mortality experience get worse, and in return, First Penn agrees to *decrease* COI rates on its customers when there is an improvement in expectations as to future mortality experience, and in no event can COI rates be based on anything other than expectations as to future mortality experience. First Penn, however, has failed to live up to its end of the bargain.

4.      Nationwide mortality experience has *improved* significantly over the past several decades. First Penn's expectations as to future mortality experience have likewise substantially changed in its favor. Insureds are living longer than First Penn originally anticipated when the policies at issue were first priced. That is one reason that First Penn's parent company, reporting on behalf of First Penn and others, has repeatedly stated in regulatory filings that mortality experiences were substantially better than it expected. Despite this improved mortality experience, First Penn has not lowered the COI rates it charges its customers.

5.      Universal and variable life policies combine death benefits with a savings or investment component, often known as the "account value." The COI charge is deducted outright from the policy owner's account value, so the policyholder forfeits the COI charge entirely to First Penn. The COI charge covers First Penn's risk – the chance that First Penn will have to pay the death benefit to the policy's owner when the insured dies. First Penn's parent company, Lincoln National Corporation (together with its affiliates, "Lincoln"), reporting on behalf of First Penn, refers to COI charges as "mortality charges." The payment of COI charges to cover First Penn's risk is the policy's insurance component, and First Penn contractually agreed to base its COI rate *only* on mortality. The COI charge is deducted on a

monthly basis, and it is calculated by multiplying the applicable "COI rate" by the net amount at risk that First Penn stands to pay out when the insured dies. Lincoln explains: "In a UL contract, policyholders have flexibility in the timing and amount of premium payments and the amount of death benefit, provided there is sufficient account value to cover all policy charges for mortality and expenses for the coming period." Lincoln further explains that "Mortality charges are either specifically deducted from the contract holder's policy account value (i.e., cost of insurance assessments or 'COI's') or are embedded in the premiums charged to the customer."

6. The subject policies here each state that the COI rates First Penn charges "will be determined by us based on our expectations as to future mortality experience." This provision is referred to by the insurance industry as a "*Single* Consideration Policy Form" because the *only* factor that the carrier can and must consider when determining COI rates is "expectations as to future mortality experience." This provision requires First Penn to *decrease* COI rates if it experiences an improvement in expected mortality from the time of pricing. In other words, if First Penn expects fewer people to die at a given rate than originally anticipated, then it will expect to pay out fewer death benefits at a given rate. And if First Penn pays out fewer death benefits over time, the COI rate should correspondingly decrease.

7. In the face of the substantially improved mortality experience that has benefited First Penn, it is apparent that First Penn has wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates if there were to be an unexpected pandemic that made mortality experience worse than anticipated, but not requiring it to *decrease* COI rates in the face of years and years of improved mortality experience—an improvement that has, in fact, already occurred.

3

8. First Penn has also wrongly "based" COI rates on factors not permitted by the contract—i.e., factors other than its "expectations as to future mortality experience."

9. First Penn's position has no merit and breaches the terms of the insurance policies. As a result of this misconduct, plaintiff seeks monetary relief for the COI overcharges that First Penn has wrongly imposed on its customers.

## THE PARTIES

10. Plaintiff Thomas Iwanski is a resident of Illinois and he owns a First Penn MoneyGuard Flex universal life insurance policy number 190193, insuring his own life, which was issued on or about October 15, 1997 by First Penn and currently has a face value of $80,000 (the "Iwanski Policy"). At issuance, Mr. Iwanski was age 66. The Iwanski Policy remains in-force with First Penn. The Iwanski Policy has not received any COI rate decrease since it was issued.

11. Defendant First Penn-Pacific Life Insurance Company is a corporation organized and existing under the laws of Indiana, having its principal place of business in Radnor, Pennsylvania. First Penn is a wholly owned subsidiary of Lincoln National Corporation, which has its principal place of business in Radnor, Pennsylvania.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. Upon information and belief, less than two-thirds of the members of the proposed classes in the aggregate are citizens of Pennsylvania. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13. This Court has personal jurisdiction over First Penn because First Penn has its principal place of business in Radnor, Pennsylvania.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including First Penn's COI rate overcharge.

## FACTUAL BACKGROUND

### A.  Cost of Insurance

15. Plaintiff's policy has the following language about how the rate used to calculate the COI charge – known as the "Cost of Insurance Rate" – will be determined:

> Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience. We can change the rates from time to time but they will never be more than those rates shown in the Table of Guaranteed Maximum Cost of Insurance Rates. Any change will be made on a uniform basis for Insureds of the same sex, insuring age and premium rate class.

The Iwanski Policy also provides that "[t]he cost of insurance is determined on a monthly basis." The set of policies at issue include all universal life policies issued on the policy form of the Iwanski Policy (i.e., Policy Form Number L-2020 series), all policies in the Iwanski Policy product line, and all policies issued by First Penn on any policy form that states that cost of insurance rates are "based on [First Penn's] expectations as to future mortality experience." These policies are referred to as "COI Class Policies." A copy of the Iwanski Policy, redacted of personal information, is attached hereto as Exhibit A. On information and belief, First Penn introduced the MoneyGuard product line in 1987.

16. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The COI Class Policies are all contracts of adhesion.

17. This policy language obligates First Penn to determine its COIs every month, and provides that the *only* factor that the carrier can and must consider when determining COI rates

5

are "expectations as to future mortality experience." Nothing else. Because the COI rates on the COI Class Policies must be based solely on expectations as to future mortality experience, COI rates must be adjusted if those expectations improve.

18.     That the contract requires rates to be "based on" mortality alone is confirmed by other provisions of the contract. The policy states that the maximum COI rates that can be charged are "based ... on" industry standard mortality tables.[1] Those maximum COI rates are explicitly set forth in the policy and are exactly equal to the rates in those industry standard tables – i.e., the maximum COI rates are based on mortality rates and nothing else. But when it comes to charging its customers actual COI rates, First Penn ignores the language of the policies and uses COI rates that are not "based on" its expectations as to mortality experience.

19.     By contrast, First Penn has issued other insurance policies that do not require it to base its COI rates on mortality alone when that is its intention, including a *later* version of this *same* product. For example, in 2000, First Penn received authorization to *change* the policy form for certain MoneyGuard products (the same product Mr. Iwanski owns, albeit a prior version of MoneyGuard) to delete the provision explicitly requiring COI rates to be based on First Penn's "expectations as to future mortality experience"; as a result of that change, the relevant sentence reads "Monthly cost of insurance rates will be determined by us" instead of "Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience."

---

[1] The policy provides: "The guaranteed cost of insurance rates are based either on the 1980 Commissioners Standard Ordinary Male Smokers and Nonsmokers Mortality Table (Age Last Birthday), or on the 1980 Commissioners Standard Ordinary Female Smokers and Nonsmokers Mortality Table (Age Last Birthday), as appropriate."

20. The limitation of factors that can be considered in setting COI rates is confirmed on page 5 of the policy which states "Any premium or factor charges will be determined or redetermined only in expectation of future experience."

21. The size of the COI charge matters to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the account value (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to First Penn (this is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the account value and invested on behalf of the policyholder or credited with interest by the insurance company).

22. First Penn has forced policyholders to pay excess COI charges by failing to adjust COI rates in the face of improving mortality, and the COI charges are in excess of what First Penn is contractually permitted to charge to cover its mortality risks.

**B.      Improving Mortality and First Penn's Unlawful Failure to Base COI Rates Solely on Expectations as to future Mortality Experience**

23. First Penn has not decreased its COI rates for COI Class Policies, despite the fact that mortality rates have improved steadily *each year* – i.e., mortality risks have only gotten *better* for First Penn over time, as people are living much longer than anticipated when the products were priced and issued.

24. Insurers like First Penn systematically quantify their "expectations as to future mortality experience." They perform experience studies which examine their historical mortality experience and, based on that mortality experience, develop predictions of the mortality experience they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age.

7

Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect mortality rate experience.

25. Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

26. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[2]

---

[2] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2_june01.pdf.

27. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that First Penn should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

28. The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

29. The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

30. The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies (including First Penn) with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy

forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. The report states: "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant mortality improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development."

31. First Penn has repeatedly acknowledged that, consistent with industry experience, its mortality experience has been better than it expected. For example, First Penn's parent (Lincoln National Corporation) has filed required interrogatory statements on behalf of First Penn with the NAIC, in each year from 2008-2014. These are sworn statements, signed by an actuary. Each year, First Penn answers the question "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation." In 2008, 2009, 2010, 2011, 2012, 2013, 2014, and 2015, First Penn included the following sentence in its response to this question: "Mortality experience is also predicted to improve in the future." And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations during the third quarter of 2016." And in its 2016 annual report, Lincoln notes that "In 2016, we experienced modestly favorable mortality." Lincoln notes in its annual reports that the "key experience assumptions" include "mortality rates" and that Lincoln "periodically

review[s]" these assumptions, but First Penn has not lowered COI rates to reflect the continuing improved mortality assumptions.

32. The same conclusion of "favorable" mortality experiences compared to carrier assumptions is also documented in annual reports. For example, in 2005, Lincoln's Life Insurance segment unlocked reserves to reflect "improved mortality assumptions." Similar improved mortality assumptions were reflected in other years. But in violation of the policy language, First Penn did not lower COI rates to reflect these improved mortality assumptions.

33. Despite this consistent trend of improving expectations of future mortality experience, First Penn has never decreased the COI rates on COI Class Policies.

34. Moreover, First Penn loaded its COI rates with undisclosed factors other than mortality, including maintenance, administrative and other expense factors, in violation of the plain language of the contract. Lincoln concedes that a major profit driver for the company is to load profit targets into its COI rates, in excess of mortality costs. It refers to this practice as generating "mortality margins." In annual reports, Lincoln has explained that "Mortality margins represent the *difference* between amounts charged to the customer to cover the mortality risk and the actual cost of reinsurance and death benefits paid," and that "[m]ortality charges" are "specifically deducted from the contract holder's policy account value (i.e. cost of insurance assessments or 'COI's')." (emphasis added) But the policies do not permit First Penn to base its COI rates on anything other than expectations as to future mortality experience – and its avowed practice of using COI rates to generate mortality margins violates the contract. As a result, First Penn overcharged policyholders even if expectations as to future mortality experience had never improved. This improper calculation of COI rates further damaged policyholders.

35. First Penn also has concealed its wrongdoing: the monthly cost of insurance rates used to calculate COI charges are not disclosed to policyholders, nor are the factors that First Penn actually used to calculate those COI rates. First Penn has never disclosed to policyholders that it is improperly using COI rates that are not based on First Penn's expectations of future mortality experience.

## CLASS ACTION ALLEGATIONS

36. This action is brought by plaintiff individually and on behalf of the "COI Overcharge" class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

37. The COI Overcharge Class consists of:

All owners of "universal life" (including variable universal life) insurance policies issued by First Penn-Pacific Life Insurance Company, or its predecessors, that provide that cost of insurance rates are "based on [First Penn's] expectations as to future mortality experience."

The COI Overcharge Class does not include defendant First Penn, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

38. The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by First Penn.

39. The claims asserted by plaintiff are typical of the claims of the COI Overcharge Class.

40. The plaintiff will fairly and adequately protect the interests of the classes and does not have any interests antagonistic to those of the other members of the classes.

41. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

42. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

43. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

    (a) the construction and interpretation of the form insurance policies at issue in this litigation;

    (b) whether First Penn's actions in failing to decrease the cost of insurance charges imposed on the COI Overcharge Class violated the terms of those form policies;

    (c) whether First Penn based its COI charges on factors other than expectations as to future mortality experience;

    (d) whether First Penn breached its contracts with plaintiff and members of the classes;

    (f) whether First Penn has experienced better mortality than it expected; and

    (g) whether plaintiff and members of the Class are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

44. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when First Penn's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and First Penn's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

45. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of plaintiff and the COI Overcharge Class.

46. The subject policies are binding and enforceable contracts.

47. First Penn breached the contract by deducting COI charges calculated from COI rates not based on expectations as to future mortality experience. These overcharges include, but are not limited to, the excess COI charges that First Penn deducted by not reducing COI rates based on improved mortality.

48. First Penn's failure to decrease COI rates also violated the contracts' requirement that First Penn determine its COI charge monthly because any such determination would have shown the need to decrease COI rates based on the improved mortality.

49. First Penn's decision to base COI rates on factors other than expectations as to future mortality alone also breaches the policy.

50. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by First Penn's conduct as set forth herein.

51. As a direct and proximate cause of First Penn's material breaches of the policies, plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff and the class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding plaintiff and the class compensatory damages;

3. Awarding plaintiff and the class pre-judgment and post-judgment interest, as well as attorney's fees and costs; and

4. Awarding plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated: April 13, 2018

Respectfully submitted,

*/s/ Gaetan J. Alfano*

Gaetan J. Alfano
Douglas E. Roberts
I.D. Nos.: 32971 & 321950
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Tel:   215-998-1441
Fax:  215-754-5181
gja@pietraallo.com

Steven G. Sklaver (*pro hac vice* application to be filed)
Glenn C. Bridgman (*pro hac vice* application to be filed)
Catriona Lavery (*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:  310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
clavery@susmangodfrey.com

Seth Ard (*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:  212-336-8330
Fax:  212-336-8340
sard@susmangodfrey.com
*Attorneys for Plaintiff*