# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS IWANSKI, on behalf of himself and all others similarly situated,<br><br>                                    Plaintiff,<br><br>        vs.<br><br>FIRST PENN-PACIFIC LIFE INSURANCE COMPANY,<br><br>                                    Defendant. | Civil Action No. 18-cv-01573-GAM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

After receiving written consent from defendant First Penn-Pacific Life Insurance Company ("First Penn"), Plaintiff Thomas Iwanski ("plaintiff"), and on behalf of himself and all others similarly situated, files this Amended Complaint. Plaintiff states as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by First Penn. Plaintiff seeks to represent a class of First Penn policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by First Penn.

2.      The plaintiff, along with numerous other First Penn policyholders, has been forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts. The subject First Penn policies specify that monthly cost of insurance ("COI") rates "will be determined by us based on our expectations as to future mortality experience"– and

nothing else. First Penn also contractually promised to determine the cost of insurance on a monthly basis.

3.      These policy provisions created a mutual and reciprocal commitment between First Penn and all class members: policyholders agree to let First Penn increase COI rates if expectations as to future mortality experience worsen, and in return, First Penn agrees to *decrease* COI rates on its customers if expectations as to future mortality experience improve, and in no event can COI rates be based on anything other than expectations as to future mortality experience. First Penn, however, has failed to live up to its end of the bargain.

4.      Nationwide mortality experience has *improved* significantly over the past several decades.  First Penn's expectations as to future mortality experience have likewise substantially changed in its favor. Insureds are living longer than First Penn originally anticipated when the policies at issue were first priced. That is one reason that First Penn's parent company, reporting on behalf of First Penn and others, has repeatedly stated in regulatory filings that mortality experiences were substantially better than it expected. Despite this improved mortality experience, First Penn has not lowered the COI rates it charges its customers.

5.      Universal and variable life policies combine death benefits with a savings or investment component, often known as the "account value." The COI charge is deducted outright from the policy owner's account value, so the policyholder forfeits the COI charge entirely to First Penn. The COI charge covers First Penn's risk – the chance that First Penn will have to pay the death benefit to the policy's owner when the insured dies. First Penn's parent company, Lincoln National Corporation (together with its affiliates, "Lincoln"), reporting on behalf of First Penn, refers to COI charges as "mortality charges." The payment of COI charges to cover First Penn's risk is the policy's insurance component, and First Penn contractually agreed to base its

COI rate *only* on mortality. The COI charge is deducted on a monthly basis and it is calculated by multiplying the applicable "COI rate" by the net amount at risk that First Penn stands to pay out when the insured dies. Lincoln explains: "In a UL contract, policyholders have flexibility in the timing and amount of premium payments and the amount of death benefit, provided there is sufficient account value to cover all policy charges for mortality and expenses for the coming period."  Lincoln further explains that "[m]ortality charges are either specifically deducted from the contract holder's policy account value (i.e., cost of insurance assessments or 'COI's') or are embedded in the premiums charged to the customer."

6.      The subject policies here each state that the COI rates First Penn charges "will be determined by us based on our expectations as to future mortality experience." This provision is referred to by the insurance industry as a "*Single* Consideration Policy Form" because the *only* factor that the carrier can and must consider when determining COI rates is "expectations as to future mortality experience." This provision requires First Penn to *decrease* COI rates if it experiences an improvement in expected mortality from the time of pricing. In other words, if First Penn expects fewer people to die at a given rate than originally anticipated, then it will expect to pay out fewer death benefits at a given rate. And if First Penn pays out fewer death benefits over time, the COI rate should correspondingly decrease.

7.      In the face of the substantially improved mortality experience that has benefited First Penn, it is apparent that First Penn has wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates if there were to be an unexpected pandemic that made mortality experience worse than anticipated, but not requiring it to *decrease* COI rates in the face of years and years of improved mortality experience—an improvement that has, in fact, already occurred.

8.      First Penn has also wrongly "based" COI rates on factors not permitted by the contract—i.e., factors other than its "expectations as to future mortality experience."

9.      First Penn's position has no merit and breaches the terms of the insurance policies.  As a result of this misconduct, plaintiff seeks monetary relief for the COI overcharges that First Penn has wrongly imposed on its customers.

## THE PARTIES

10.      Plaintiff Thomas Iwanski is a resident of Illinois and he owns a First Penn MoneyGuard Flex universal life insurance policy number 190193, insuring his own life, which was issued on or about October 15, 1997 by First Penn and currently has a face value of $80,000 (the "Iwanski Policy"). At issuance, Mr. Iwanski was age 66. The Iwanski Policy remains in-force with First Penn. The Iwanski Policy has not received any COI rate decrease since it was issued.

11.      Defendant First Penn-Pacific Life Insurance Company is a corporation organized and existing under the laws of Indiana, having its principal place of business in Radnor, Pennsylvania. First Penn is a wholly owned subsidiary of Lincoln National Corporation, which has its principal place of business in Radnor, Pennsylvania.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. Upon information and belief, less than two-thirds of the members of the proposed classes in the aggregate are citizens of Pennsylvania. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13.     This Court has personal jurisdiction over First Penn because First Penn has its principal place of business in Radnor, Pennsylvania.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including First Penn's COI rate overcharge.

## FACTUAL BACKGROUND

### A.    Cost of Insurance

15.     Plaintiff's policy has the following language about how the rate used to calculate the COI charge – known as the "Cost of Insurance Rate" – will be determined:

> Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience. We can change the rates from time to time but they will never be more than those rates shown in the Table of Guaranteed Maximum Cost of Insurance Rates. Any change will be made on a uniform basis for Insureds of the same sex, insuring age and premium rate class.

The Iwanski Policy also provides that "[t]he cost of insurance is determined on a monthly basis." The set of policies at issue include all universal life policies issued on the policy form of the Iwanski Policy (i.e., Policy Form Number L-2020 series), all policies in the Iwanski Policy product line, and all policies issued by First Penn on any policy form that states that cost of insurance rates are "based on [First Penn's] expectations as to future mortality experience." These policies are referred to as "COI Class Policies." A copy of the Iwanski Policy, redacted of personal information, is attached hereto as Exhibit A. On information and belief, First Penn introduced the MoneyGuard product line in 1987.

16.     The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The COI Class Policies are all contracts of adhesion.

17.     This policy language obligates First Penn to determine its COIs every month, and provides that the *only* factor that the carrier can and must consider when determining COI rates

are "expectations as to future mortality experience." Nothing else. Because the COI rates on the COI Class Policies must be based solely on expectations as to future mortality experience, COI rates must be adjusted if those expectations improve.

18.    That the contract requires rates to be "based on" mortality alone is confirmed by other provisions of the contract. The policy states that the maximum COI rates that can be charged are "based . . . on" industry standard mortality tables.[1] Those maximum COI rates are explicitly set forth in the policy and are exactly equal to the rates in those industry standard tables – i.e., the maximum COI rates are based on mortality rates and nothing else. But when it comes to charging its customers actual COI rates, First Penn ignores the language of the policies and uses COI rates that are not "based on" its expectations as to mortality experience.

19.    By contrast, First Penn has issued other insurance policies that do not require it to base its COI rates on mortality alone when that is its intention, including a *later* version of this *same* product. For example, in 2000, First Penn received authorization to *change* the policy form for certain MoneyGuard products (the same product Mr. Iwanski owns, albeit a prior version of MoneyGuard) to delete the provision explicitly requiring COI rates to be based on First Penn's "expectations as to future mortality experience"; as a result of that change, the relevant sentence reads "Monthly cost of insurance rates will be determined by us" instead of "Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience."

---

[1] The policy provides: "The guaranteed cost of insurance rates are based either on the 1980 Commissioners Standard Ordinary Male Smokers and Nonsmokers Mortality Table (Age Last Birthday), or on the 1980 Commissioners Standard Ordinary Female Smokers and Nonsmokers Mortality Table (Age Last Birthday), as appropriate."

20.     The limitation of factors that can be considered in setting COI rates is confirmed on page 5 of the policy which states "Any premium or factor charges will be determined or redetermined only in expectation of future experience."

21.     The size of the COI charge matters to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the account value (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to First Penn (this is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the account value and invested on behalf of the policyholder or credited with interest by the insurance company).

22.     First Penn has forced policyholders to pay excess COI charges by failing to adjust COI rates in the face of improving mortality, and the COI charges are in excess of what First Penn is contractually permitted to charge to cover its mortality risks.

B.     **Improving Mortality and First Penn's Unlawful Failure to Base COI Rates Solely on Expectations as to Future Mortality Experience**

23.     First Penn has not decreased its COI rates for COI Class Policies, despite the fact that mortality rates have improved steadily *each year* – i.e., mortality risks have only gotten *better* for First Penn over time, as people are living much longer than anticipated when the products were priced and issued.

24.     Insurers like First Penn systematically quantify their "expectations as to future mortality experience." They perform experience studies which examine their historical mortality experience and, based on that mortality experience, develop predictions of the mortality experience they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age.

Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect mortality rate experience.

25.    Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

26.    The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[2]

---

[2] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2_june01.pdf.

27.    The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table."  This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that First Penn should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

28.    The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

29.    The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

30.    The 1990-95 Basic Tables reflected the death rates observed by 21 large life insurance companies (including First Penn) with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy

forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic Tables each show significant mortality improvements from the 1990-95 Basic Tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. The report states: "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant mortality improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development."

31.    First Penn has repeatedly acknowledged that, consistent with industry experience, its mortality experience has been better than it expected. For example, First Penn's parent (Lincoln National Corporation) has filed required interrogatory statements on behalf of First Penn with the NAIC, in each year from 2008-2014. These are sworn statements, signed by an actuary. Each year, First Penn answers the question "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation." In 2008, 2009, 2010, 2011, 2012, 2013, 2014, and 2015, First Penn included the following sentence in its response to this question: "Mortality experience is also predicted to improve in the future." And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations during the third quarter of 2016." And in its 2016 annual report, Lincoln notes that "In 2016, we experienced modestly favorable mortality." Lincoln notes in its annual reports that the "key experience assumptions" include "mortality rates" and that

Lincoln "periodically review[s]" these assumptions, but First Penn has not lowered COI rates to reflect the continuing improved mortality assumptions.

32.     The same conclusion of "favorable" mortality experiences compared to carrier assumptions is also documented in annual reports. For example, in 2005, Lincoln's Life Insurance segment unlocked reserves to reflect "improved mortality assumptions." Similar improved mortality assumptions were reflected in other years. But in violation of the policy language, First Penn did not lower COI rates to reflect these improved mortality assumptions.

33.     Despite this consistent trend of improving expectations of future mortality experience, First Penn has never decreased the COI rates on COI Class Policies.

34.     Moreover, First Penn loaded its COI rates with undisclosed factors other than mortality, including maintenance, administrative and other expense factors, in violation of the plain language of the contract. Lincoln concedes that a major profit driver for the company is to load profit targets into its COI rates, in excess of mortality costs. It refers to this practice as generating "mortality margins." In annual reports, Lincoln has explained that "[m]ortality margins represent the *difference* between amounts charged to the customer to cover the mortality risk and the actual cost of reinsurance and death benefits paid," and that "[m]ortality charges" are "specifically deducted from the contract holder's policy account value (i.e. cost of insurance assessments or 'COI's')." (emphasis added). But the policies do not permit First Penn to base its COI rates on anything other than expectations as to future mortality experience – and its avowed practice of using COI rates to generate mortality margins violates the contract. As a result, First Penn overcharged policyholders even if expectations as to future mortality experience had never improved.  This improper calculation of COI rates further damaged policyholders.

35. First Penn also has concealed its wrongdoing: the monthly cost of insurance rates used to calculate COI charges are not disclosed to policyholders, nor are the factors that First Penn actually used to calculate those COI rates. First Penn has never disclosed to policyholders that it is improperly using COI rates that are not based on First Penn's expectations of future mortality experience.

## CLASS ACTION ALLEGATIONS

36. This action is brought by plaintiff individually and on behalf of the "COI Overcharge" class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

37. The COI Overcharge Class consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued by First Penn-Pacific Life Insurance Company, or its predecessors, that provide: (1) an insurance or cost of insurance charge or deduction calculated using a rate based on expectations of future mortality experience; (2) additional but separate policy charges, deductions, or expenses; (3) an investment, interest bearing, or savings component; and (4) a death benefit.

The COI Overcharge Class does not include defendant First Penn, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

38. The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by First Penn.

39. The claims asserted by plaintiff are typical of the claims of the COI Overcharge Class.

40. The plaintiff will fairly and adequately protect the interests of the classes and does not have any interests antagonistic to those of the other members of the classes.

41.     Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

42.     Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

43.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether First Penn's actions in failing to decrease the cost of insurance charges imposed on the COI Overcharge Class violated the terms of those form policies;

(c)     whether First Penn based its COI charges on factors other than expectations as to future mortality experience;

(d)     whether First Penn breached its contracts with plaintiff and members of the classes;

(e)     whether First Penn has experienced better mortality than it expected; and

(f)     whether plaintiff and members of the Class are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress

individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)      when First Penn's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)      this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)      without a class action, many class members would continue to suffer injury, and First Penn's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

45.      Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of plaintiff and the COI Overcharge Class.

46.      The subject policies are binding and enforceable contracts.

47.      First Penn breached the contract by deducting COI charges calculated from COI rates not based on expectations as to future mortality experience. These overcharges include, but are not limited to, the excess COI charges that First Penn deducted by not reducing COI rates based on improved mortality.

48. First Penn's failure to decrease COI rates also violated the contracts' requirement that First Penn determine its COI charge monthly because any such determination would have shown the need to decrease COI rates based on the improved mortality.

49. First Penn's decision to base COI rates on factors other than expectations as to future mortality alone also breaches the policy.

50. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by First Penn's conduct as set forth herein.

51. As a direct and proximate cause of First Penn's material breaches of the policies, plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding plaintiff and the class compensatory damages;

3. Awarding plaintiff and the class pre-judgment and post-judgment interest, as well as attorney's fees and costs; and

4. Awarding plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated:  November 16, 2018                                Respectfully submitted,

                                                         */s/ Gaetan J. Alfano*
                                                         Gaetan J. Alfano
                                                         Douglas E. Roberts
                                                         I.D. Nos.: & 321950
                                                         Pietragallo Gordon Alfano Bosick &
                                                         Raspanti, LLP
                                                         1818 Market Street, Suite 3402
                                                         Philadelphia, PA 19103
                                                         Tel:    215-998-1441
                                                         Fax:    215-754-5181
                                                         gja@pietragallo.com
                                                         der@pietragallo.com

                                                         Steven G. Sklaver (*pro hac vice*)
                                                         Glenn C. Bridgman (*pro hac vice*)
                                                         Bryan Caforio (*pro hac vice*)
                                                         Richard L. Jolly (*pro hac vice*)
                                                         Catriona Lavery (*pro hac vice*)
                                                         SUSMAN GODFREY L.L.P.
                                                         1900 Avenue of the Stars, Suite 1400
                                                         Los Angeles, CA 90067-6029
                                                         Tel:    310-789-3100
                                                         Fax:    310-789-3150
                                                         ssklaver@susmangodfrey.com
                                                         gbridgman@susmangodfrey.com
                                                         bcaforio@susmangodfrey.com
                                                         rjolly@susmangodfrey.com
                                                         clavery@susmangodfrey.com

                                                         Seth Ard (*pro hac vice*)
                                                         SUSMAN GODFREY L.L.P.
                                                         1301 Avenue of the Americas, 32nd Floor
                                                         New York, NY 10019
                                                         Tel.:   212-336-8330
                                                         Fax:    212-336-8340
                                                         sard@susmangodfrey.com

*Attorneys for Plaintiff*

# EXHIBIT A



**FIRST PENN-PACIFIC
LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

Principal Office Address:  1300 S. Clinton St, 8805, Ft. Wayne, Indiana 46801
Executive Office Address:  1801 S. Meyers Rd., Oakbrook Terrace, Illinois  60181
          (Please address any inquiries to the Executive Office)

Monthly Expense Charges:
    $ 4.00 per policy, per month all years.

Increase in Specified Amount Charge: $ .00 per $1,000 of Increased Specified Amount

Percentage of Premium Expense Charges:
    6.0% of all premiums received in the first policy year.
    3.5% of all premiums received thereafter.

Policy Loan Rate:  7.0 Percent in advance.

The Guaranteed Interest Rate used in calculating account values is
.32737% per month, compounded monthly.  That is equivalent to 4%
per year, compounded yearly.

Minimum Specified Amount:       $10,000

                    POLICY SCHEDULE

Policy Number:   190193          Insured:  THOMAS A. IWANSKI

Policy Date:      October 15, 1997  Maturity Date:      October 15, 2026

Monthly Anniversary Day:  15     Initial Premium:        $27,704.24

Death Benefit Option: Option 1   Planned Periodic Premium:    $885.00

Sex:  Male   Age: ███          Payable:                Annually

Premium Rate Class: Preferred

Initial Specified Amount:       $80,000

NOTE:    THE MATURITY DATE IS THE POLICY ANNIVERSARY FOLLOWING THE INSURED'S
95TH BIRTHDAY.   COVERAGE MAY EXPIRE PRIOR TO THE MATURITY DATE IF NO PREMIUMS
ARE PAID AFTER THE INITIAL PREMIUM OR IF SUBSEQUENT PREMIUMS ARE INSUFFICIENT
TO CONTINUE COVERAGE TO SUCH DATE.   COVERAGE MAY ALSO BE AFFECTED BY A CHANGE
IN CURRENT VALUES.

Surrender Charges and riders, if any, shown on the following page.

**FIRST PENN-PACIFIC**
**LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

POLICY SCHEDULE CONTINUED

Policy Number:    190193            Policy Date:    October 15, 1997

Insured:    THOMAS A. IWANSKI
Riders:

   Convalescent Care Benefits Rider

   Extension of Convalescent Care Benefits Rider

   Guaranteed Insurability Rider

| POLICY YEAR | SURRENDER CHARGES |
|---|---|
| 1 | $ 3,217.60 |
| 2 | 3,217.60 |
| 3 | 3,217.60 |
| 4 | 3,217.60 |
| 5 | 3,217.60 |
| 6 | 2,895.84 |
| 7 | 2,574.08 |
| 8 | 2,252.32 |
| 9 | 1,930.56 |
| 10 | 1,608.80 |
| 11 | 1,287.04 |
| 12 | 965.28 |
| 13 | 643.52 |
| 14 | 321.76 |
| 15-29 | 0.00 |

Partial Withdrawal Charge: No charge for the first partial withdrawal during any
                           one policy year. For each partial withdrawal in
                           excess of one per policy year, the Withdrawal Charge
                           shall be $25.00 during the first 14 policy years and
                           zero thereafter.

There are no additional surrender charges for Increases in Insurance Coverage.

Basic Monthly Premium        $250.21
      Years Applicable:  1st seven policy years.

1801 South Meyers Road   Oakbrook Terrace, Illinois  60181   (630) 495-3336

**FIRST PENN-PACIFIC LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

POLICY SCHEDULE CONTINUED

Insured: THOMAS A. IWANSKI
Age: ▮▮ Sex: Male
Policy Number: 190193

### Convalescent Care Benefits Rider

Deductible Period . . . . . . . . . . . . . . . . . . .    90 days

Daily Maximums-
        Adult Day Care . . . . . . . . . . . . . . . . . $    54.79

        Home Health Care . . . . . . . . . . . . . . . . $   109.59
            (Includes Respite Care which is limited to a
            maximum of 21 days per calendar year)

        Nursing Home Care  . . . . . . . . . . . . . . . $   109.59

Annual Benefit -
        Care Planning  . . . . . . . . . . . . . . . . . $   500.00

Benefit Limit . . . . . . . . . . . . . . . . . . .    $80,000.00
(Provides at least   730 days of coverage)

First Monthly Premium . . . . . . . . . . . . . . . . $     1.03
(Premiums deducted from the policy account value
each month are 12.0% -- the "Convalescent Care
Rider Premium Percent" -- of the monthly charge
for Basic Life Insurance, which varies)

### Extension of Convalescent Care Benefits Rider

Daily Maximums-
        Adult Day Care . . . . . . . . . . . . . . . . . $    54.79

        Home Health Care . . . . . . . . . . . . . . . . $   109.59
            (Includes Respite Care which is limited to a
            maximum of 21 days per calendar year)

        Nursing Home Care  . . . . . . . . . . . . . . . $   109.59

Annual Benefit -
        Care Planning  . . . . . . . . . . . . . . . . . $   500.00

Additional Benefit Limit . . . . . . . . . . . . .    $80,000.00
(Provides at least   730 ADDITIONAL days of coverage)

Monthly Premium . . . . . . . . . . . . . . . . . . . $    35.75
(Deducted monthly from the policy account value)

Your Personal Long Term Care Advisor may be reached by calling (800)323-1746
                    3b(Continued)                                QUAL



**FIRST PENN-PACIFIC LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

## AMENDMENT OF APPLICATION

Date: **November 20, 1997**                                    Policy # **190193**

I (We), **Thomas A. Iwanski**, hereby amend my (our) application, dated **Augsut 19, 1997**, to First Penn-Pacific Life Insurance Company for insurance on the life of **Thomas A. Iwanski**, as follows:

☐ Specified Amount Changed       From _____       To _____

☐ Plan of Insurance Changed       From _____       To _____

☐ Planned Periodic Premium Changed    Mode  **Annual** _____    Amount   **$885.00** _____

                                Add'l Premium  **$26,819.24**       Initial Premium   **$27,704.24**

☐ It is understood that this policy has been issued with an underwriting classification other than applied for. The following risk classification has been assigned to _____

   ☐ Rating of Table _____
   ☐ Flat Extra Rate of _____ per thousand, which will expire on: _____
   ☐ Standard Cost of Insurance Rates
   The reason for the underwriting classification is: _____

   **It is understood that this underwriting classification will affect the costs and/or benefits of my policy.**

☐ _____ has been excluded from coverage due to: _____

☐ Convalescent Care Benefit Rider:  Benefit Period ____ Years;  Home Health Care  ☐Yes  ☐No;

   Extension Rider   ☐Yes  ☐No;  If yes, ____ Years   ☐Lifetime

☐ Other _____
   _____
   _____

I agree that these changes will be an amendment to and form a part of the above referenced application and of any policy issued or reissued as a result of that application. I further agree that these changes will be binding on any person or entity that may have or claim any interest under that policy.

Dated at ⊗ _____       this ⊗ _____   day of ⊗ _____       19 ⊗ _____

Witness ⊗ _____                   Signed  ⊗ _____
                                                    Proposed Owner

Signed  ⊗ _____                          ⊗ _____
              Proposed Insured                         Proposed Owner(s)
                                                **Thomas A. Iwanski**

### Please read this form carefully before signing

THIS AMENDMENT BECOMES A PART OF THE POLICY TO WHICH IT IS ATTACHED. ANY CHANGES, ADDITIONS OR NOTATIONS ON THIS FORM WILL RENDER IT NULL AND VOID. SIGNED ORIGINAL MUST BE RETURNED TO HOME OFFICE. COVERAGE IS NOT EFFECTIVE UNTIL SIGNED AMENDMENT IS RECEIVED AT HOME OFFICE.

Executive Office:     1801 South Meyers Road     Oakbrook Terrace, Illinois 60181     (708) 495-3336



**FIRST PENN-PACIFIC**
**LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

## AMENDMENT

This Amendment becomes a part of the policy to which it is attached.

1. The following paragraph is hereby **deleted** from the "Changes in Insurance Coverage" provision in the "Insurance Coverage Provisions" section:

   If the Specified Amount is decreased by written request from the Owner, we may deduct from the Account Value a pro-rata surrender charge. The pro-rata surrender charge is described in the Nonforfeiture Provisions of this policy. A pro-rata surrender charge will not be deducted from the Account Value if the Specified Amount is decreased because of a partial withdrawal of the Account Value or because of a change from Option 1 to Option 2.

2. The "Pro-Rata Surrender Charge" provision in the "Nonforfeiture Provisions" section is hereby **deleted** in its entirety.

Signed for the Company at Oakbrook Terrace, Illinois.

President

1801 South Meyers Road • Oakbrook Terrace, Illinois 60181-5214 • (630) 495-3336

L-2142AA (11/88)

## TABLE OF GUARANTEED
## MAXIMUM COST OF INSURANCE RATES
## STANDARD PREFERRED

### Monthly Cost of Insurance Rates
### Per $1000

| Attained Age | Male | Female | Attained Age | Male | Female |
|---|---|---|---|---|---|
| 0 | 0.22 | 0.16 | 48 | 0.36 | 0.31 |
| 1 | 0.09 | 0.07 | 49 | 0.39 | 0.34 |
| 2 | 0.08 | 0.07 | 50 | 0.43 | 0.36 |
| 3 | 0.08 | 0.07 | 51 | 0.47 | 0.39 |
| 4 | 0.08 | 0.06 | 52 | 0.51 | 0.42 |
| 5 | 0.07 | 0.06 | 53 | 0.56 | 0.46 |
| 6 | 0.07 | 0.06 | 54 | 0.62 | 0.49 |
| 7 | 0.07 | 0.06 | 55 | 0.69 | 0.53 |
| 8 | 0.06 | 0.06 | 56 | 0.76 | 0.57 |
| 9 | 0.06 | 0.06 | 57 | 0.83 | 0.61 |
| 10 | 0.06 | 0.06 | 58 | 0.91 | 0.64 |
| 11 | 0.07 | 0.06 | 59 | 1.01 | 0.69 |
| 12 | 0.08 | 0.06 | 60 | 1.11 | 0.74 |
| 13 | 0.09 | 0.06 | 61 | 1.22 | 0.80 |
| 14 | 0.10 | 0.07 | 62 | 1.36 | 0.87 |
| 15 | 0.12 | 0.07 | 63 | 1.51 | 0.97 |
| 16 | 0.13 | 0.08 | 64 | 1.67 | 1.08 |
| 17 | 0.14 | 0.08 | 65 | 1.86 | 1.19 |
| 18 | 0.14 | 0.08 | 66 | 2.06 | 1.31 |
| 19 | 0.14 | 0.08 | 67 | 2.27 | 1.43 |
| 20 | 0.14 | 0.08 | 68 | 2.50 | 1.55 |
| 21 | 0.14 | 0.09 | 69 | 2.76 | 1.69 |
| 22 | 0.14 | 0.09 | 70 | 3.07 | 1.86 |
| 23 | 0.13 | 0.09 | 71 | 3.40 | 2.06 |
| 24 | 0.13 | 0.09 | 72 | 3.76 | 2.30 |
| 25 | 0.13 | 0.09 | 73 | 4.19 | 2.60 |
| 26 | 0.12 | 0.09 | 74 | 4.67 | 2.94 |
| 27 | 0.12 | 0.10 | 75 | 5.18 | 3.31 |
| 28 | 0.12 | 0.10 | 76 | 5.72 | 3.72 |
| 29 | 0.12 | 0.10 | 77 | 6.28 | 4.16 |
| 30 | 0.12 | 0.10 | 78 | 6.88 | 4.64 |
| 31 | 0.12 | 0.11 | 79 | 7.52 | 5.17 |
| 32 | 0.13 | 0.11 | 80 | 8.22 | 5.77 |
| 33 | 0.13 | 0.12 | 81 | 9.02 | 6.46 |
| 34 | 0.14 | 0.12 | 82 | 9.92 | 7.26 |
| 35 | 0.14 | 0.13 | 83 | 10.91 | 8.16 |
| 36 | 0.15 | 0.13 | 84 | 11.99 | 9.16 |
| 37 | 0.16 | 0.14 | 85 | 13.12 | 10.24 |
| 38 | 0.17 | 0.16 | 86 | 14.30 | 11.39 |
| 39 | 0.18 | 0.17 | 87 | 15.50 | 12.62 |
| 40 | 0.20 | 0.18 | 88 | 16.72 | 13.93 |
| 41 | 0.21 | 0.20 | 89 | 17.97 | 15.33 |
| 42 | 0.23 | 0.21 | 90 | 19.29 | 16.82 |
| 43 | 0.25 | 0.23 | 91 | 20.68 | 18.45 |
| 44 | 0.27 | 0.24 | 92 | 22.22 | 20.28 |
| 45 | 0.29 | 0.26 | 93 | 24.04 | 22.44 |
| 46 | 0.31 | 0.28 | 94 | 26.50 | 25.22 |
| 47 | 0.34 | 0.29 | | | |

Children's Term Rider Monthly Cost of Insurance Rate per $1,000.00: $0.5000.

SINGLE PREMIUM ENDOWMENT AT 95
GUARANTEED INSURANCE RATES PER $1000
STANDARD PREFERRED

| Attained Age | Male | Female | Attained Age | Male | Female |
|---|---|---|---|---|---|
| 0 | 79.39 | 68.18 | 48 | 357.24 | 317.22 |
| 1 | 80.14 | 69.16 | 49 | 368.77 | 327.37 |
| 2 | 82.40 | 71.15 | 50 | 380.60 | 337.79 |
| 3 | 84.79 | 73.25 | 51 | 392.71 | 348.47 |
| 4 | 87.30 | 75.46 | 52 | 405.09 | 359.42 |
| 5 | 89.95 | 77.77 | 53 | 417.72 | 370.62 |
| 6 | 92.75 | 80.19 | 54 | 430.57 | 382.06 |
| 7 | 95.71 | 82.73 | 55 | 443.65 | 393.77 |
| 8 | 98.83 | 85.39 | 56 | 456.93 | 405.74 |
| 9 | 102.11 | 88.16 | 57 | 470.41 | 418.00 |
| 10 | 105.53 | 91.06 | 58 | 484.10 | 430.58 |
| 11 | 109.09 | 94.09 | 59 | 497.97 | 443.51 |
| 12 | 112.73 | 97.22 | 60 | 512.01 | 456.78 |
| 13 | 116.43 | 100.45 | 61 | 526.19 | 470.37 |
| 14 | 120.14 | 103.78 | 62 | 540.50 | 484.25 |
| 15 | 123.86 | 107.20 | 63 | 554.88 | 498.36 |
| 16 | 127.58 | 110.72 | 64 | 569.30 | 512.63 |
| 17 | 131.30 | 114.33 | 65 | 583.72 | 527.04 |
| 18 | 135.06 | 118.06 | 66 | 598.12 | 541.58 |
| 19 | 139.06 | 121.93 | 67 | 612.51 | 556.29 |
| 20 | 143.19 | 125.95 | 68 | 626.88 | 571.20 |
| 21 | 147.49 | 130.11 | 69 | 641.22 | 586.34 |
| 22 | 151.98 | 134.42 | 70 | 655.50 | 601.70 |
| 23 | 156.69 | 138.90 | 71 | 669.59 | 617.25 |
| 24 | 161.62 | 143.55 | 72 | 683.49 | 632.89 |
| 25 | 166.79 | 148.37 | 73 | 697.22 | 648.52 |
| 26 | 172.22 | 153.37 | 74 | 710.61 | 664.01 |
| 27 | 177.91 | 158.56 | 75 | 723.61 | 679.30 |
| 28 | 183.84 | 163.94 | 76 | 736.25 | 694.36 |
| 29 | 190.03 | 169.52 | 77 | 748.54 | 709.19 |
| 30 | 196.47 | 175.29 | 78 | 760.54 | 723.82 |
| 31 | 203.17 | 181.28 | 79 | 772.30 | 738.27 |
| 32 | 210.13 | 187.48 | 80 | 783.84 | 752.53 |
| 33 | 217.35 | 193.91 | 81 | 795.14 | 766.57 |
| 34 | 224.82 | 200.56 | 82 | 806.16 | 780.32 |
| 35 | 232.54 | 207.44 | 83 | 816.82 | 793.69 |
| 36 | 240.53 | 214.56 | 84 | 827.09 | 806.66 |
| 37 | 248.78 | 221.88 | 85 | 837.00 | 819.25 |
| 38 | 257.29 | 229.43 | 86 | 846.64 | 831.54 |
| 39 | 266.07 | 237.19 | 87 | 856.18 | 843.67 |
| 40 | 275.11 | 245.16 | 88 | 865.85 | 855.86 |
| 41 | 284.41 | 253.35 | 89 | 876.02 | 868.39 |
| 42 | 293.98 | 261.75 | 90 | 887.15 | 881.70 |
| 43 | 303.82 | 270.37 | 91 | 899.92 | 896.40 |
| 44 | 313.94 | 279.23 | 92 | 915.32 | 913.43 |
| 45 | 324.35 | 288.35 | 93 | 934.98 | 934.30 |
| 46 | 335.03 | 297.71 | 94 | 961.54 | 961.54 |
| 47 | 345.99 | 307.33 |  |  |  |

## POLICY SCHEDULE CONTINUED
## PERCENTAGE OF ACCOUNT VALUE TABLE

| Attained Age | Percentage | | Attained Age | Percentage |
|---|---|---|---|---|
| 0 - 40 | 250% | | 69 | 116% |
| 41 | 243 | | 70 | 115 |
| 42 | 236 | | 71 | 113 |
| 43 | 229 | | 72 | 111 |
| 44 | 222 | | 73 | 109 |
| 45 | 215 | | 74 | 107 |
| 46 | 209 | | 75 | 105 |
| 47 | 203 | | 76 | 105 |
| 48 | 197 | | 77 | 105 |
| 49 | 191 | | 78 | 105 |
| 50 | 185 | | 79 | 105 |
| 51 | 178 | | 80 | 105 |
| 52 | 171 | | 81 | 105 |
| 53 | 164 | | 82 | 105 |
| 54 | 157 | | 83 | 105 |
| 55 | 150 | | 84 | 105 |
| 56 | 146 | | 85 | 105 |
| 57 | 142 | | 86 | 105 |
| 58 | 138 | | 87 | 105 |
| 59 | 134 | | 88 | 105 |
| 60 | 130 | | 89 | 105 |
| 61 | 128 | | 90 | 105 |
| 62 | 126 | | 91 | 104 |
| 63 | 124 | | 92 | 103 |
| 64 | 122 | | 93 | 102 |
| 65 | 120 | | 94 | 101 |
| 66 | 119 | | 95 | 100 |
| 67 | 118 | | | |
| 68 | 117 | | | |



**FIRST PENN-PACIFIC LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

Plan Designed For: IWANSKI, THOMAS A.

Table of Guaranteed Policy Values

| END OF POLICY YEAR | MINIMUM SURREND VALUES | CONTINUATION OF INSURANCE YRS | DAYS |
|---|---|---|---|
| 1 | 21,847 | 9 | 121 |
| 2 | 21,557 | 8 | 181 |
| 3 | 21,071 | 7 | 241 |
| 4 | 20,348 | 6 | 271 |
| 5 | 19,325 | 5 | 331 |
| 6 | 18,272 | 5 | 31 |
| 7 | 16,801 | 4 | 121 |
| 8 | 14,793 | 3 | 151 |
| 9 | 12,123 | 2 | 211 |
| 10 | 8,650 | 1 | 271 |
| 11 | 4,196 | 0 | 301 |
| 12 | 0 | 0 | 0 |

THE VALUES SHOWN ARE BASED ON THE GUARANTEED MAXIMUM COST OF INSURANCE AND THE
GUARANTEED RATE OF INTEREST.  IF THE PLANNED PERIODIC PREMIUM IS PAID ON THE
FIRST DAY OF EACH PREMIUM PAYMENT PERIOD IN THE AMOUNT AND FOR THE MODE SPECIFIED
ON THE POLICY DATA PAGE, AND IF THERE IS NO INDEBTEDNESS, NO PARTIAL SURRENDERS,
AND NO CHANGE IN THE SPECIFIED AMOUNT, THE GUARANTEED VALUES WILL BE AS SHOWN.

**FIRST PENN-PACIFIC LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

Plan Designed For: IWANSKI, THOMAS A.

Table of Guaranteed Policy Values

| END OF POLICY YEAR | MINIMUM SURREND VALUES | CONTINUATION OF INSURANCE YRS | DAYS |
|---|---|---|---|
| 1 | 24,428 | 10 | 121 |
| 2 | 26,978 | 10 | 181 |
| 3 | 29,558 | 10 | 241 |
| 4 | 32,169 | 10 | 301 |
| 5 | 34,420 | 10 | 301 |
| 6 | 34,225 | 9 | 331 |
| 7 | 33,768 | 8 | 331 |
| 8 | 32,975 | 7 | 331 |
| 9 | 33,038 | 7 | 121 |
| 10 | 34,670 | 7 | 31 |
| 11 | 36,129 | 6 | 301 |
| 12 | 37,398 | 6 | 211 |
| 13 | 38,444 | 6 | 91 |
| 14 | 39,226 | 5 | 301 |
| 15 | 39,679 | 5 | 151 |
| 16 | 39,373 | 4 | 331 |
| 17 | 38,489 | 4 | 151 |
| 18 | 36,841 | 3 | 301 |
| 19 | 34,168 | 3 | 91 |
| 20 | 30,124 | 2 | 211 |
| 21 | 24,208 | 1 | 331 |
| 22 | 15,709 | 1 | 61 |
| 23 | 3,577 | 0 | 121 |
| 24 | 0 | 0 | 0 |

THE VALUES SHOWN ARE BASED ON THE GUARANTEED MAXIMUM COST OF INSURANCE AND THE GUARANTEED RATE OF INTEREST.  IF THE PLANNED PERIODIC PREMIUM IS PAID ON THE FIRST DAY OF EACH PREMIUM PAYMENT PERIOD IN THE AMOUNT AND FOR THE MODE SPECIFIED ON THE POLICY DATA PAGE, AND IF THERE IS NO INDEBTEDNESS, NO PARTIAL SURRENDERS, AND NO CHANGE IN THE SPECIFIED AMOUNT, THE GUARANTEED VALUES WILL BE AS SHOWN.

MONEY-GRD-FLEX                                      0    Nov  5   1997
1801 South Meyers Road   Oakbrook Terrace, Illinois  60181   (630) 495-3336

## PREMIUM, GRACE PERIOD AND REINSTATEMENT PROVISIONS

**Payment of Premiums.** The Initial Premium is due on the Policy Date and is payable in advance. The amounts and frequency of Planned Periodic Premium payments are shown in the Policy Schedule. Policy anniversaries occur annually and are computed from the Policy Date.

The policy will not take effect until it has been delivered and the Initial Premium has been paid prior to death and prior to any change in health as shown in the application.

The Initial Premium is payable at the Executive Office or to an authorized agent. All other premiums are payable in advance at our Executive Office. Receipts will be furnished upon request.

Changes in frequency and increases or decreases in amount of Planned Periodic Premium payments may be made by the Owner. We reserve the right to limit the amount of any increase. We will send premium payment reminder notices to the Owner on written request. The notices may be sent annually, semi-annually or quarterly. Planned Periodic Premium payments of $25.00 or more may be made on a monthly basis under our special payment facility.

Additional premium payments may be made at any time during the continuance of this policy. We reserve the right to limit the number and amount of additional premium payments.

We may limit the amount of premium paid so that this policy will continue to be qualified as a life insurance policy under any applicable law or regulation. To continue such qualification, we may refuse to accept any further premium payments or return any premium paid, including interest, which is in excess of such limit unless an annuity rider is attached to the policy. If an annuity rider is attached to the policy, any excess premium with interest credited thereon, shall be paid into the annuity rider. The interest rate credited will be our current rate at that time, but not less than the guaranteed rate as shown on the Policy Schedule.

**Grace Period.** If on any Monthly Anniversary Day the net surrender value will not cover the next monthly deduction, a grace period of 61 days will be allowed to pay a premium that will cover the monthly deduction described in the Nonforfeiture Provisions section. Notice of such premium will be mailed to the last known address of the Owner and Assignee at least 30 days before the end of the grace period. If such premium is not paid within the grace period, all coverage under the policy will terminate without value at the end of the 61 day period. If a death occurs during the grace period, any overdue monthly deductions will be deducted from the proceeds.

The Basic Monthly Premium and the years applicable are shown on the Policy Schedule. During the number of years applicable, if there have been no policy changes, the policy will not lapse if the total paid premiums, less any partial withdrawals and debt, equal or exceed the sum of the Basic Monthly Premiums to date. Policy changes are defined as any one or more of the following items:

1. a change from Option 1 to Option 2 of the Death Benefit provisions, as defined in the "Change in Types of Coverage" section of the "Insurance Coverage Provisions"; or

2. an increase in Specified Amount, as defined in point 2 of the "Changes in Insurance Coverage" section of the "Insurance Coverage Provisions"; or

3. the addition of one or more riders to the policy.

**Reinstatement.** If this policy terminates, as provided in the Grace Period section, it may be reinstated at any time within five years after the date of termination and prior to the Maturity Date. The reinstatement is subject to:

1. receipt of evidence of insurability satisfactory to us; and

2. payment of a minimum premium sufficient to keep the policy in force for two months.

The effective date of a reinstatement shall be the Monthly Anniversary Date that falls on or next follows the date the application for reinstatement is approved by us.

The account value on the date of reinstatement will be the amount provided by the premium paid at reinstatement.

## OWNERSHIP, ASSIGNMENT AND BENEFICIARY PROVISIONS

**Owner.** While the Insured is alive, all rights in this policy belong to the Owner. All of the Owner's rights in this policy belong to the estate of the Owner if the Owner dies before the Insured. Owner means the Owner identified in the application or a successor in interest.

**Change of Owner.** The Owner may transfer all ownership rights and privileges to a new Owner only in writing on a form satisfactory to us. The change will be effective when recorded by us. Any payment made or any action taken or allowed by us before the change in ownership is recorded will be without prejudice to us. Unless provided otherwise, a change in ownership will not affect the interest of any Beneficiary.

**Assignment.** We will not be affected by any assignment of the policy until the assignment, in a form satisfactory to us, is filed with us. We do not assume responsibility for the validity or sufficiency of any assignment. The interest of any Beneficiary will be subject to the rights of any assignee of record.

**Beneficiary.** The Beneficiary on the Policy Date will be as designated in the application. Unless provided otherwise, the interest of any Beneficiary who dies before the person insured will vest in the Owner or the Owner's estate.

**Change of Beneficiary.** A new Beneficiary may be named from time to time. A request for change of Beneficiary must be in writing on a form satisfactory to us and filed with us. The request must be signed by the Owner and any irrevocable Beneficiary.

A change of Beneficiary will not take effect until recorded in writing by us. When a change of Beneficiary has been recorded, whether or not the Insured is then alive, it will take effect as of the date the request was signed. Any payment made or any action taken or allowed by us before the change of Beneficiary is recorded will be without prejudice to us.

## GENERAL PROVISIONS

**The Policy.** The policy, including any attached riders, the application and any supplemental applications are the entire contract. All statements made in an application will, in the absence of fraud, be deemed representations and not warranties. No statement will be used to void this policy or in defense of a claim unless it is contained in the application, or a supplemental application, or application for reinstatement and a copy of such application is attached to the policy when issued or made a part of the policy when a change in insurance coverage or reinstatement became effective.

No modification of this policy shall be binding on us unless in writing and made by our President, Vice President, Secretary or Assistant Secretary.

Inquiries may be directed to our Principal Office or Executive Office.

**Nonparticipation.** This policy is issued at guaranteed non-participating cost of insurance rates. Any premium or factor charges will be determined or redetermined only in expectation of future experience. We will not attempt to recoup prior losses by means of changes to premiums or factors. This policy will not share in our profits or surplus earnings. We will pay no dividends on this policy.

**Proceeds.** Proceeds means the amount payable: (1) on the Maturity Date; (2) on the surrender of this policy; or (3) after the death of an insured person.

The proceeds payable on the death of the Insured shall be the Insured's Death Benefit, less any debt. The proceeds payable on the death of any person insured by rider shall be as provided in the rider.

If the policy is surrendered the proceeds shall be the net surrender value.

On the Maturity Date the proceeds shall be the account value less any debt.

The proceeds are subject to any adjustments provided in the Error in Age or Sex, Incontestability and Suicide sections.

**Payment of Proceeds.** The proceeds are subject first to any debt to us and then to the interest of any assignee of record. However, unless otherwise provided, the Death Benefit of any person insured by rider shall not be subject to any debt to us. Payments to satisfy any debt to us and any assignee shall each be paid in one sum. Unless an Optional Method of Settlement is elected, the balance of any Death Benefit shall be paid in one sum to the designated Beneficiary. If no Beneficiary survives, the proceeds shall be paid in one sum to the Owner, if living; otherwise to the estate of the Owner. Unless an Optional Method of Settlement is elected, any proceeds payable on the Maturity Date or upon surrender of this policy shall be paid to the Owner in one sum

**Age.** The Insured's issue age is shown on the Policy Schedule. Age means age last birthday.

**Error in Age or Sex.** If there is an error in the age or sex of the Insured or any person insured by rider, the proceeds payable shall be the amount that would be purchased by the most recent monthly deduction at the true age and sex. The monthly deduction is described in the Nonforfeiture Provisions section.

**Suicide.** If the Insured commits suicide, while sane or insane, within two years from the Policy Date, the total liability shall be the premiums paid prior to death, less any debt and any prior partial withdrawals and less the cost of any riders.

If the Insured commits suicide, while sane or insane, within two years from the effective date of any increase in insurance or any reinstatement, the total liability with respect to such increase or reinstatement shall be its cost.

**Incontestability.** This policy shall be incontestable after it has been in force for two years during the lifetime of the Insured.

Any increase in coverage effective after the Policy Date or any reinstatement shall be incontestable only after such increase or reinstatement has been in force during the lifetime of the Insured for two years from its effective date.

A contest of an increase in Specified Amount or a reinstatement will be based on misrepresentations in the application for such increase or reinstatement.

**Annual Report.** We shall send a report to the Owner, at least once each year, which shows the premium payments, expense charges, interest credited, mortality charges and partial withdrawals since the last report, plus any outstanding loans, the current account value, and current net surrender value.

**Projection of Benefits.** Upon the Owner's written request we will furnish a report which shows future benefits and values. The report will be based on as-

sumptions as to Specified Amount, type of Death Benefit option, interest rate and future premium payments as may be specified by the Owner and such other assumptions as are necessary and specified by us. A reasonable fee may be charged.

**Maturity Date.** The Maturity Date is shown on the Policy Schedule. The Maturity Date is the date on which the policy matures. It is the last date the insurance coverage can remain in force.

Coverage will end prior to the Maturity Date if the premiums paid and the interest credited are not sufficient to continue coverage to such date.

**Effective Date of Coverage.** The effective date of coverage under this policy shall be as follows:

1. The Policy Date shall be the effective date for all coverage provided in the original application.

2. For any increase or addition to coverage, the effective date shall be the Monthly Anniversary Day that falls on or next follows the date we approve the supplemental application. The effective date will be shown on the supplemental policy schedule.

3. For any insurance that has been reinstated, the effective date shall be the Monthly Anniversary Day that falls on or next follows the date we approve the application for reinstatement.

**Monthly Anniversary Day.** The Monthly Anniversary Day is the same day each month as the Policy Date.

**Interest Before Settlement.** If the proceeds are not paid in one sum or under an Optional Method of Settlement within 30 days after they become payable, or the time provided by law, whichever is less, we will pay interest on the unpaid proceeds. Interest will accrue from the date the proceeds are payable to the date of payment, but not for more than one year, at a yearly rate of 3½ percent, or the rate and time provided by law, whichever is greater.

**Elections, Designations, Changes and Requests.** All elections, designations, changes and requests must be in a written form satisfactory to us and will become effective only after they have been approved by us. We reserve the right to require the policy to be returned to our Executive Office for endorsement of any change.

**Termination.** All coverage under this policy will terminate when any one of the following events occur:

1. The Owner requests that coverage terminate.

2. The Insured dies.

3. The policy matures.

4. The grace period ends.

5. The policy is surrendered.

## INSURANCE COVERAGE PROVISIONS

**Death Benefit.** The Death Benefit depends on the Death Benefit option in effect on the date of the Insured's death. Under Option 1, the Specified Amount includes the account value. Under Option 2, the Specified Amount does not include the account value. The Death Benefit Option in effect is shown on the Policy Schedule.

1. **Option 1.** The Death Benefit will be the greater of:
   (a) the Specified Amount on the date of death; or
   (b) the Minimum Death Benefit.

2. **Option 2.** The Death Benefit will be the greater of:
   (a) the account value on the date of death, plus the Specified Amount on the date of death; or
   (b) the Minimum Death Benefit.

**Minimum Death Benefit.** The Minimum Death Benefit is equal to a percentage of the account value. The applicable percentage depends on the attained age of the Insured and is shown in the Percentage of Account Value Table shown on the Policy Schedule.

**Minimum Specified Amount.** The Minimum Specified Amount permitted under this policy is shown on the Policy Schedule.

**Change in Types of Coverage.** The Owner, by written request, may change between Options 1 and 2 of the Death Benefit provision, effective on the Monthly Anniversary Day that falls on or next follows receipt of

such request, subject to the following:

(a) If the change is from Option 1 to Option 2, the Insured's Specified Amount after such change shall be equal to the Insured's Specified Amount prior to such change, less the account value on the date of change.

(b) If the change is from Option 2 to Option 1, the Insured's Specified Amount after such change shall be equal to the Insured's Specified Amount prior to such change plus the account value on the date of change.

A change in type of coverage may result in a Specified Amount less than the Minimum Specified Amount shown on the Policy Schedule.

**Changes in Insurance Coverage.** At any time after the first policy anniversary, insurance coverage may be increased or decreased by written request from the Owner to change the Insured's Specified Amount, subject to the following conditions:

1. Specified Amount Decreases.

   Any decrease will become effective on the Monthly Anniversary Day that falls on or next follows receipt of request. Any such decrease shall reduce insurance in the following order:

   (a) against insurance provided by the most recent increase;

(b) against the next most recent increases successively; and

(c) against insurance provided under the original application.

If the Specified Amount is decreased by written request from the Owner, we may deduct from the Account Value a pro-rata surrender charge. The pro-rata surrender charge is described in the Nonforfeiture Provisions of this policy. A pro-rata surrender charge will not be deducted from the Account Value if the Specified Amount is decreased because of a partial withdrawal of the Account Value or because of a change from Option 1 to Option 2.

A requested decrease in the Insured's Specified Amount may not be made if such decrease would result in the Insured's Specified Amount being less than the Minimum Specified Amount shown on the Policy Schedule.

2. Specified Amount Increases.

Any request for an increase must be applied for on a supplemental application. Such increase shall be subject to evidence of insurability satisfactory to us. An increase shall also be subject to the sufficiency of the net surrender value to cover the next monthly deduction.

If the Specified Amount is increased by written request from the Owner, we may deduct from the Account Value a charge for an increase in Specified Amount. This increase charge is described in the

Nonforfeiture Provisions of this policy. A charge for an increase in Specified Amount will not be deducted from the Account Value because of a change from option 2 to option 1 of the Death Benefit Provision.

**Application for Additional Insurance.** Additional insurance on the life of persons other than the Insured may be applied for by supplemental application. Approval of the additional insurance shall be subject to evidence of insurability satisfactory to us. Additional insurance shall also be subject to the sufficiency of the net surrender value to cover the next monthly deduction. Such new insurance will be provided by rider and will become effective on the effective date shown in the Supplemental Policy Schedule.

**Exchange.** The Owner may, after 31 days written notice, exchange this policy without evidence of insurability for a new policy on any plan of insurance, except term insurance, issued by us at the time of exchange. This policy must be surrendered. The amount of insurance on the new policy may be for any amount up to, but not more than, (a), plus (b), less (c) where:

(a) is the current amount of the Insured's Death Benefit under this policy.

(b) is the cash value of the new policy on the date of exchange.

(c) is the then current account value of this policy.

All plans of insurance available for exchange are subject to plan requirements. Such new policy will be effective on the date of termination of this policy.

## NONFORFEITURE PROVISIONS

**Net Premium.** A net premium is the premium paid, less the Percentage of Premium Expense Charge shown on the Policy Schedule.

**Account Value.** The account value on the Policy Date shall be the Initial Net Premium, less the Monthly Deduction for the first month of the Policy. On each Monthly Anniversary Day after the Policy Date the account value shall be calculated as (a), plus (b), minus (c), plus (d), where:

(a) is the account value on the preceding Monthly Anniversary Day;

(b) is all net premiums received since the preceding Monthly Anniversary Day;

(c) is the monthly deduction for the month following the Monthly Anniversary Day;

(d) is one month's interest on item (a).

On any day other than a Monthly Anniversary Day, the account value shall be calculated as (e) plus (f), where:

(e) is the account value as of the preceding Monthly Anniversary Day.

(f) is all net premiums received since the preceding Monthly Anniversary Day.

**Monthly Deduction.** The monthly deduction shall be calculated as (a), plus (b), where:

(a) is the cost of insurance (as described below) plus the cost of additional benefits provided by rider.

(b) is the monthly expense charge shown on the Policy Schedule.

**Interest Rates.** The guaranteed interest rate applied in the calculation of the account value is shown on the Policy Schedule.

Interest in excess of the guaranteed rate may be applied in the calculation of the account value at such increased rates and in such manner as determined by us. Such rate will be based on our future expectations as to interest earnings.

A lower rate of interest will be applied to the portion of the account value which equals the amount of any debt, but such rate will not be less than the guaranteed rate.

**Cost of Insurance.** The cost of insurance is determined on a monthly basis. The cost of insurance is determined separately for each Specified Amount.

The cost of insurance for the Insured is calculated as (a), multiplied by the result of (b), minus (c), where:

(a) is the cost of insurance rate as described in the Cost of Insurance Rate section;

(b) is the Insured's Death Benefit at the beginning of the policy month divided by one plus the guaranteed monthly interest rate;

(c) is the account value at the beginning of the policy month before deducting the monthly deduction for the month.

If Option 1 is in effect and there have been increases in the Specified Amount, the account value will be first considered a part of the Initial Specified Amount. If the account value exceeds the Initial Specified Amount, it will be considered a part of additional Specified Amounts resulting from increases in the order of the increases.

**Cost of Insurance Rate.** The monthly cost of insurance rate is based on the Insured's sex, attained age and premium rate class. For the Specified Amount at issue, the premium rate class on the policy will apply. For each increase in the Specified Amount, the premium rate class applicable to the increase will apply. The premium rate class applicable to the most recent increase will apply to any increase in Death Benefit which is a result of the application of the Minimum Death Benefit provision.

Attained age means age last birthday on the prior policy anniversary.

The guaranteed monthly cost of insurance rate is shown in the Table of Guaranteed Maximum Cost of Insurance Rates.

Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience. We can change the rates from time to time but they will never be more than those rates shown in the Table of Guaranteed Maximum Cost of Insurance Rates. Any change will be made on a uniform basis for Insureds of the same sex, insuring age and premium rate class.

The guaranteed cost of insurance rates are based either on the 1980 Commissioners Standard Ordinary Male Smokers and Nonsmokers Mortality Table (Age Last Birthday), or on the 1980 Commissioners Standard Ordinary Female Smokers and Nonsmokers Mortality Table (Age Last Birthday), as appropriate.

**Basis of Computation.** Minimum values are based on the 1980 Commissioners Standard Ordinary Male Smokers and Nonsmokers Mortality Table (Age Last Birthday), or the 1980 Commissioners Standard Ordinary Female Smokers and Nonsmokers Mortality Table (Age Last Birthday).

The nonforfeiture values for this policy are never less than the minimum required on the Policy Date by the state in which this policy is delivered. Where required a detailed statement of the method of computing values has been filed with the insurance supervisory official of the state in which this policy is delivered.

**Continuation of Insurance.** In the event Planned Periodic Premium payments are not continued and if no unscheduled premium payments are made, insurance coverage under this policy and any benefits provided by rider will be continued in force.

Such coverage shall be continued until the earlier of:

1. the Monthly Anniversary Day on which the net surrender value is insufficient to cover the monthly deduction for the following month; or

2. the Maturity Date.

If the net surrender value is not sufficient to cover the monthly deduction for the following month, the Grace Period provision will apply.

If the policy is continued under this provision until the Maturity Date and the Insured is then living, we will pay the Owner any remaining account value less any debt.

This provision will not continue the policy beyond the Maturity Date or continue any rider beyond the date for its termination, as provided in the rider. This policy may be surrendered at any time for its net surrender value while this provision is in effect.

**Surrender and Net Surrender Value.** This policy may be surrendered at any time during the lifetime of the Insured upon written request by the Owner to us. The amount payable on surrender of this policy shall be the account value less any debt and less any surrender charge on the date of surrender. This amount is called the net surrender value. The net surrender value will be paid in cash or under an elected Optional Method of Settlement.

If surrender is requested under this section within 30 days of a policy anniversary, the net surrender value shall not be less than the net surrender value on that anniversary, less any cash loans or partial withdrawals made on or after such anniversary.

If this policy is surrendered, coverage shall terminate as of the next Monthly Anniversary Day. We reserve the right to defer the payment of the net surrender value for the period permitted by law, but not for more than six months unless the surrender is to pay premiums on policies with us.

**Surrender Charge.** The Surrender Charge is shown on the Policy Schedule.

**Pro-Rata Surrender Charge.** The Pro-Rata Surrender Charge, referenced in the Insurance Coverage Provision, equals (a), times (b), divided by (c), where:

(a) is the decrease in Specified Amount subject to a surrender charge and is determined as $(1) - (2) + (3) - (4)$ where,

    (1) is the decrease in Specified Amount.

    (2) is the sum of all requested and approved prior increases in Specified Amount as described in the Insurance Coverage Provisions.

    (3) is the sum of all requested prior decreases

in Specified Amount as described in the Insurance Coverage Provisions.

(4) is the sum of all prior decreases in Specified Amount subject to a surrender charge.

If (a) is less than zero, it will be set equal to zero and the decrease in Specified Amount will not be subject to a surrender charge.

(b) is the Surrender Charge then in effect for the applicable policy year.

(c) is the Initial Specified Amount immediately prior to the decrease or the Initial Specified Amount, whichever is less.

If the pro-rata surrender charge, as computed above, is greater than the Account Value, then the pro-rata surrender charge will be set equal to the Account Value.

When a pro-rata surrender charge is deducted as described above, the schedule of Surrender Charges then in effect shall be reduced by a proportion equal to item (a) above divided by item (c) above.

**Partial Withdrawal.** A partial withdrawal of Account Value may be made at any time during the lifetime of the Insured by written request of the Owner. The amount withdrawn from the Account Value may be any amount not to exceed the current net surrender value.

A partial withdrawal of Account Value will reduce the Death Benefit. The Account Value will be reduced by the amount withdrawn. If Option 1 is in effect, the Specified Amount will also be reduced by the amount of the partial withdrawal. A Partial Withdrawal Charge will be deducted from each partial withdrawal. The Partial Withdrawal Charge is shown on the Policy Schedule.

The Partial Withdrawal Charge will never be greater than the Surrender Charge then in effect for the applicable policy year.

When a Partial Withdrawal Charge is deducted, the schedule of Surrender Charges then in effect shall be reduced by a proportion equal to (a) divided by (b), where:

(a) is the Partial Withdrawal Charge levied; and

(b) is the Surrender Charge then in effect for the applicable policy year.

We reserve the right to defer payment of a partial withdrawal for the period permitted by law, but not for more than six months except to pay premiums to us.

**Increase in Specified Amount Charge.** The Increase in Specified Amount Charge, referenced in the Changes in Insurance Coverage provision is shown on the Policy Schedule under "Monthly Expense Charges".

The Specified Amount subject to the Increase in Specified Amount Charge is determined as (1) - (2), where:

(1) is the Specified Amount in effect immediately after the latest increase; and

(2) is the highest Specified Amount which was in effect prior to the latest increase.

If the result of (1) - (2) is less than or equal to zero, the increase shall not be subject to a charge.

## LOAN PROVISION

**Cash Loans.** During the continuance of this policy, we will grant a loan against the policy provided:

1. a written loan agreement is executed; and
2. a satisfactory assignment of the policy to us is made.

The policy will be the sole security for the loan. The amount of the loan with interest may not exceed the net surrender value as of the date of the policy loan. We reserve the right to defer a loan for the period permitted by law, but not for more than six months except to pay premiums to us.

**Loan Interest.** Interest on any loan will be at the Policy Loan Rate shown on the Policy Schedule, payable annually in advance, except for any period for which we may charge interest at a lower Policy Loan Rate. We

will give at least 30 days written notice to the Owner and to any assignee of record of any change in the Policy Loan Rate.

Interest not paid when due will then be added to the loan and bear interest at the same rate.

**Repayment.** Any debt may be repaid in whole or in part at any time while this policy is in force.

If at any time the total debt against the policy, including interest, equals or exceeds the then account value less any surrender charge, the policy will become void, but not until 61 days after notice has been mailed to the last known addresses of the Insured, the Owner and the Assignee.

## OPTIONAL METHODS OF SETTLEMENT

Upon written request, we will apply all or part of the net proceeds that may be payable under the policy in accordance with any one of the options below. Such options will be available only with our consent if:

1. The proceeds to be settled under any option are $2,500 or less;
2. Any installment or interest payment is $25 or less; or

3. Any payee is a corporation, partnership, association, trustee or assignee.

Before the death of an insured person, the request shall be made by the Owner. If an Optional Method of Settlement is not in effect at the death of an insured person, the request may then be made by the Beneficiary. Option E is available only while the Insured is alive.

**Option A: Annuity Certain.**  We will pay a definite number of equal installments. The first installment will be payable on the date proceeds are settled under the option. The amount of each installment will be determined from the Option A Table. The Option A Table is based on a guaranteed interest rate of 4 percent per year compounded yearly.

**Option B: Life Annuity with Certain Period.**  We will pay a definite number of equal monthly installments, and will pay as long thereafter as the payee lives. The first installment will be payable on the date proceeds are settled under the option. The amount of each installment will be determined from the Option B Table based on the payee's sex and settlement age. The settlement age shown in the Option B Table will be the payee's age last birthday on the date the first installment is paid. The Option B Table is based on a guaranteed interest rate of 4 percent per year compounded yearly.

**Option C: As a Deposit at Interest.**  We will retain the proceeds while the payee is alive and will pay interest yearly at a rate of not less than 4 percent per year.

**Option D: Installments Until Proceeds are Exhausted.**  We will pay installments of specified amounts until the proceeds with any interest are exhausted. The first installment will be payable on the date proceeds are settled under the option. The installment amounts must be at least $120 per year per $1,000 of proceeds retained. Interest will be payable at a rate of not less than 4 percent per year compounded yearly.

**Option E: Single Premium Endowment at 95.**  The Owner may surrender this policy at any time during the lifetime of the Insured and before the Insured's 95 birthday and apply the proceeds to purchase Single Premium Endowment at 95 insurance coverage on the Insured, subject to the following:

1. Written request for such coverage must be made to us.

2. The amount of Single Premium Endowment at 95 insurance that may be purchased without evidence of insurability shall be calculated as (a), plus (b), less (c) where:

   (a) is the current amount of the Insured's Death Benefit under this policy.

   (b) is the amount applied as a Single Premium for the new policy.

   (c) is the then current account value of this policy.

3. A larger amount of Single Premium Endowment at 95 coverage will be issued only upon submission of evidence of insurability satisfactory to us.

4. The date of issue of the new policy will be the date that the Insured's coverage under this policy terminates.

5. The Single Premium for the new policy will be based on the single premium rates then in effect as determined by us. The single premium rates will not be greater than those shown in the Table of Single Premium Endowment at 95 Rates, based on the Insured's sex and age last birthday on the date of issue of the new policy.

**Additional Options.**  Any proceeds payable under the policy may also be settled under any other method of settlement offered by us at the time of the request.

**Excess Interest.**  Excess interest as determined by us may be paid or credited from time to time in addition to the payments guaranteed under any Optional Method of Settlement.

**Proof Payee is Alive.**  Prior to making any payment under an income option we shall have the right to require proof satisfactory to us that the payee is alive on the due date of each payment. In such case the payment shall not be due until we have received the proof required.

**Proof of Age.**  Prior to making any payment under Option B, we shall require proof satisfactory to us of the payee's sex and date of birth.

**Death of Payee.**  On the death of the last payee, unless otherwise provided in the election or by subsequent beneficiary designation, we shall pay in one sum to such payee's estate any unpaid sum left with us under Options C or D, plus any unpaid interest. The commuted value of any remaining unpaid installments that are certain to be paid under Options A or B shall be paid in one sum to the payee's estate. The commuted value shall be on the basis of 4 percent per year compounded yearly.

**Surrender Option.**  During the Insured's lifetime, the Owner may surrender this policy and request the proceeds be applied under this option subject to the following requirements:

1. The policy must have been in force for at least 6 years.

2. Total premiums paid less any outstanding loans and any partial withdrawals must equal or exceed the Basic Monthly Premiums shown on the Policy Schedule times the number of months the policy has been in force.

3. The net surrender value on the date of surrender must be at least $2,500.

4. Any installment payment under this option must be at least $25.

5. A written request and the policy must be sent to the Company.

If the above conditions are met, the net surrender value plus the surrender charge, if any, as shown on the Policy Schedule may be applied under Option B of the Settlement Options.

The Owner may elect any one of the installment periods shown in the Option B table.

The policy will terminate on the date this option becomes effective.

Unpaid installments under this option may not be commuted.

## Optional Methods of Settlement (Continued)
## Amount of Installment For Each $1,000 of Proceeds Applied

| Option A Table | | Option B Table | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | For Males | | | For Females | | |
| Number of years payable | Amount of monthly Installment | Settlement age of payee last birthday | Number of monthly Installments certain | | | Number of monthly Installments certain | | |
| | | | 120 | 180 | 240 | 120 | 180 | 240 |
| 1 | $84.84 | 10* | $3.58 | $3.58 | $3.58 | $3.51 | $3.51 | $3.51 |
| 2 | 43.25 | 11 | 3.60 | 3.59 | 3.59 | 3.52 | 3.52 | 3.52 |
| 3 | 29.40 | 12 | 3.61 | 3.61 | 3.60 | 3.53 | 3.53 | 3.53 |
| 4 | 22.47 | 13 | 3.62 | 3.62 | 3.62 | 3.54 | 3.54 | 3.54 |
| 5 | 18.32 | 14 | 3.64 | 3.64 | 3.63 | 3.55 | 3.55 | 3.55 |
| 6 | 15.56 | 15 | 3.65 | 3.65 | 3.65 | 3.57 | 3.57 | 3.56 |
| 7 | 13.59 | 16 | 3.67 | 3.67 | 3.66 | 3.58 | 3.58 | 3.58 |
| 8 | 12.12 | 17 | 3.69 | 3.68 | 3.68 | 3.59 | 3.59 | 3.59 |
| 9 | 10.97 | 18 | 3.71 | 3.70 | 3.70 | 3.61 | 3.60 | 3.60 |
| 10 | 10.06 | 19 | 3.72 | 3.72 | 3.71 | 3.62 | 3.62 | 3.62 |
| 11 | 9.31 | 20 | 3.74 | 3.74 | 3.73 | 3.64 | 3.63 | 3.63 |
| 12 | 8.69 | 21 | 3.76 | 3.76 | 3.75 | 3.65 | 3.65 | 3.65 |
| 13 | 8.17 | 22 | 3.78 | 3.78 | 3.77 | 3.67 | 3.67 | 3.66 |
| 14 | 7.72 | 23 | 3.81 | 3.80 | 3.79 | 3.68 | 3.68 | 3.68 |
| 15 | 7.34 | 24 | 3.83 | 3.82 | 3.82 | 3.70 | 3.70 | 3.70 |
| 16 | 7.00 | 25 | 3.85 | 3.85 | 3.84 | 3.72 | 3.72 | 3.71 |
| 17 | 6.71 | 26 | 3.88 | 3.87 | 3.86 | 3.74 | 3.74 | 3.73 |
| 18 | 6.44 | 27 | 3.91 | 3.90 | 3.89 | 3.76 | 3.76 | 3.75 |
| 19 | 6.21 | 28 | 3.93 | 3.93 | 3.91 | 3.78 | 3.78 | 3.77 |
| 20 | 6.00 | 29 | 3.96 | 3.96 | 3.94 | 3.81 | 3.80 | 3.79 |
| 21 | 5.81 | 30 | 3.99 | 3.99 | 3.97 | 3.83 | 3.82 | 3.82 |
| 22 | 5.64 | 31 | 4.03 | 4.02 | 4.00 | 3.85 | 3.85 | 3.84 |
| 23 | 5.49 | 32 | 4.06 | 4.05 | 4.03 | 3.88 | 3.87 | 3.87 |
| 24 | 5.35 | 33 | 4.10 | 4.08 | 4.06 | 3.91 | 3.90 | 3.89 |
| 25 | 5.22 | 34 | 4.13 | 4.12 | 4.10 | 3.94 | 3.93 | 3.92 |
| | | 35 | 4.17 | 4.16 | 4.13 | 3.97 | 3.96 | 3.95 |
| | | 36 | 4.22 | 4.20 | 4.17 | 4.00 | 3.99 | 3.98 |
| | | 37 | 4.26 | 4.24 | 4.20 | 4.03 | 4.02 | 4.01 |
| | | 38 | 4.31 | 4.28 | 4.24 | 4.07 | 4.06 | 4.04 |
| | | 39 | 4.35 | 4.33 | 4.28 | 4.10 | 4.09 | 4.07 |
| | | 40 | 4.40 | 4.37 | 4.32 | 4.14 | 4.13 | 4.11 |
| | | 41 | 4.46 | 4.42 | 4.37 | 4.18 | 4.17 | 4.14 |
| | | 42 | 4.51 | 4.47 | 4.41 | 4.22 | 4.21 | 4.18 |
| | | 43 | 4.57 | 4.52 | 4.46 | 4.27 | 4.25 | 4.22 |
| | | 44 | 4.63 | 4.58 | 4.50 | 4.32 | 4.29 | 4.26 |
| | | 45 | 4.69 | 4.63 | 4.55 | 4.36 | 4.34 | 4.31 |
| | | 46 | 4.76 | 4.69 | 4.60 | 4.42 | 4.39 | 4.35 |
| | | 47 | 4.83 | 4.75 | 4.65 | 4.47 | 4.44 | 4.40 |
| | | 48 | 4.90 | 4.81 | 4.70 | 4.53 | 4.50 | 4.44 |
| | | 49 | 4.97 | 4.88 | 4.75 | 4.59 | 4.55 | 4.49 |

* Ages 10 and under.

## Option B Table
### (Continued)

| Settlement age of payee last birthday | For Males | | | For Females | | |
|---|---|---|---|---|---|---|
| | Number of monthly installments certain | | | Number of monthly installments certain | | |
| | 120 | 180 | 240 | 120 | 180 | 240 |
| 50 | $5.05 | $4.94 | $4.81 | $4.65 | $4.61 | $4.55 |
| 51 | 5.12 | 5.01 | 4.86 | 4.72 | 4.67 | 4.60 |
| 52 | 5.21 | 5.08 | 4.92 | 4.79 | 4.74 | 4.66 |
| 53 | 5.29 | 5.16 | 4.98 | 4.87 | 4.80 | 4.72 |
| 54 | 5.38 | 5.23 | 5.03 | 4.94 | 4.87 | 4.78 |
| 55 | 5.48 | 5.31 | 5.09 | 5.03 | 4.95 | 4.84 |
| 56 | 5.58 | 5.39 | 5.15 | 5.11 | 5.02 | 4.90 |
| 57 | 5.68 | 5.47 | 5.21 | 5.20 | 5.10 | 4.97 |
| 58 | 5.79 | 5.56 | 5.27 | 5.30 | 5.19 | 5.03 |
| 59 | 5.90 | 5.64 | 5.33 | 5.40 | 5.28 | 5.10 |
| 60 | 6.02 | 5.73 | 5.39 | 5.51 | 5.37 | 5.17 |
| 61 | 6.14 | 5.83 | 5.45 | 5.62 | 5.46 | 5.24 |
| 62 | 6.27 | 5.92 | 5.50 | 5.74 | 5.56 | 5.31 |
| 63 | 6.41 | 6.01 | 5.56 | 5.86 | 5.66 | 5.38 |
| 64 | 6.55 | 6.11 | 5.61 | 6.00 | 5.77 | 5.44 |
| 65 | 6.70 | 6.21 | 5.66 | 6.14 | 5.87 | 5.51 |
| 66 | 6.85 | 6.30 | 5.71 | 6.29 | 5.98 | 5.57 |
| 67 | 7.01 | 6.40 | 5.75 | 6.45 | 6.10 | 5.63 |
| 68 | 7.17 | 6.49 | 5.79 | 6.62 | 6.21 | 5.69 |
| 69 | 7.34 | 6.58 | 5.83 | 6.80 | 6.32 | 5.74 |
| 70 | 7.51 | 6.67 | 5.87 | 6.98 | 6.43 | 5.78 |
| 71 | 7.69 | 6.76 | 5.89 | 7.18 | 6.54 | 5.82 |
| 72 | 7.87 | 6.84 | 5.92 | 7.37 | 6.64 | 5.86 |
| 73 | 8.05 | 6.91 | 5.94 | 7.58 | 6.74 | 5.89 |
| 74 | 8.23 | 6.98 | 5.96 | 7.78 | 6.83 | 5.91 |
| 75 | 8.41 | 7.05 | 5.97 | 7.99 | 6.91 | 5.93 |
| 76 | 8.58 | 7.11 | 5.98 | 8.20 | 6.98 | 5.95 |
| 77 | 8.76 | 7.16 | 5.99 | 8.40 | 7.05 | 5.96 |
| 78 | 8.92 | 7.20 | 5.99 | 8.59 | 7.10 | 5.97 |
| 79 | 9.08 | 7.23 | 6.00 | 8.78 | 7.15 | 5.98 |
| 80 | 9.23 | 7.26 | 6.00 | 8.96 | 7.19 | 5.99 |
| 81 | 9.37 | 7.28 | 6.00 | 9.12 | 7.22 | 5.99 |
| 82 | 9.50 | 7.30 | 6.00 | 9.26 | 7.25 | 5.99 |
| 83 | 9.62 | 7.31 | 6.00 | 9.39 | 7.27 | 6.00 |
| 84# | 9.72 | 7.32 | 6.00 | 9.50 | 7.28 | 6.00 |

# Ages 84 and over.

**PART I OF APPLI~~CATI~~ON TO FIRST PENN-PACIFIC LIFE INS~~UR~~ANCE COMPANY**
Please print using black ink.

| 1a. Proposed Insured | 1b. Sex | 2a. Plan: (enter plan name shown on proposal): | 2b. Specified Amount |
|---|---|---|---|
| _Thomas A. Iwanski_ <br> Full First Name  Middle Initial  Last Name | ☒ ☐ <br> M  F | _MoneyGuard Flex_ <br> *Indicate CC Rider Option at ** below. | $ _80,000_ <br> ☒ Option 1 ☐ Option 2 |

| 1c. Date of Birth | 1d. Age | 1e. Place of Birth | 1f. Soc. Sec. No. | 2c. Optional Benefits |
|---|---|---|---|---|
| Mo./Day/Yr. | | | | ☐ Waiver of Monthly ☐ _____ <br> Deductions ☐ _____ |

3. Children's Term Rider:  **Number of Units** _____

| Name | Date of Birth | Age Last Birthday | Sex M  F | Place of Birth |
|---|---|---|---|---|
| | | | ☐ ☐ | |
| | | | ☐ ☐ | |
| | | | ☐ ☐ | |

Children: Coverage applies only to current and future children of the Proposed Insured who are between 15 days and 21 years of age. Each unit is $1,000 for each covered child, with a minimum of 2 units and a maximum of 10 units.

| 4. Residence of Proposed Insured | 6. Premium |
|---|---|
| <br><br><br> *Home Phone | a. Mode ☐ Annual ☐ Semi-Annual ☒ Quarterly <br> ☐ PAC ☐ Gov't Allot ☐ Single Premium <br> b. Planned Periodic Premium (esc) $ _885.00_ <br> c. Additional Initial Premium (Amount in (esc) $ _28,000_ <br> excess of Planned Periodic Premium) <br> d. Total Initial Premium (b + c) $ _28,000_ <br> e. Amount Submitted with Application $ _0 885_ |

| 5. Applicant (Owner) if different than Proposed Insured | 7. Employer (Proposed Insured): |
|---|---|
| Name and Relationship <br> Number and Street <br> City   State   Zip Code <br> Soc. Sec. No. or Tax I.D. No. | a. Name _____ <br> b. Address _____ <br><br> c. Occupation _____ |

8. Beneficiary (print full name and relationship)
   Primary: _____
   Contingent: _____

9. Insurance in force and pending on Proposed Insured:

| Name of Company | Year of Issue | Amount | Personal or Business Insurance |
|---|---|---|---|
| | | | |
| | | | |

| 10. REGARDING ALL PROPOSED INSUREDS: (Give details to "YES" answers in No. 13) | YES | NO |
|---|---|---|
| a) Will the policy applied for replace or change any life insurance or annuity in force? (If "YES," complete the required state replacement form.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| b) Has any life or health insurance applied for ever been declined, postponed or issued other than applied for? | | |

| 11. HAS ANY PROPOSED INSURED: (If "YES," complete aviation/avocation questionnaire) | YES | NO |
|---|---|---|
| a) Piloted an airplane within the past 5 years or have any intention of becoming a pilot? . . . . . . . . . . . . . . . . | | |
| b) Ever participated in a sport or avocation such as racing, sky diving, hang gliding, scuba or skin diving? . . . . | | |

| 12. HAS ANY PROPOSED INSURED: (Give details to "YES" answers in No. 13) | YES | NO |
|---|---|---|
| a) Smoked cigarettes within the past 12 months? (If "YES," how many daily?) . . . . . . . . . . . . . . . . . . . . . . . . | | |
| b) Been a smoker and quit? (If "YES," when? Give month and year.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| c) Within the past three years had driver's license restricted or revoked, or been cited for more than two moving violations? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| d) Any intention of traveling or residing outside the U.S. or Canada within the next two years? . . . . . . . . . . . . | | |

13. Explanation and Instructions:

**CC Rider Option:
☐ 2 + 0
☒ 2 + 2
☐ 3/Life
☐ None (Life Only)
☐ Other _____

**PART II OF APPLICATION TO FI₋  ₋ PENN-PACIFIC LIFE INSURANCE COₘ₋ ₋ NY — HEALTH STATEMENT**

Complete this section even if the Proposed Insured will be medically ₋ ₋mined.

The answers to the following questions apply to the Proposed Insured and all children proposed for coverage:

| | YES NO |
|---|---|
| 1. a. Name and address of your personal physician (if none, so state) | |
| b. Date and reason last consulted? | |
| 2. Proposed Insured: | |
| a. Height: ▮ in.  Weight ▮ lbs. | |
| b. Weight lost in past 12 months ▮ lbs. | |
| Reason: ____ | |

**3. During the past ten years have you:   YES NO**

a. had or been advised to have an X-ray, electrocardiogram, laboratory tests, or surgical operation? .........................

b. had clinic, hospital or sanatorium treatment? ..

c. received advice or treatment for the use of alcohol or drugs or been a member of A.A.? ..

d. used marijuana, cocaine, heroin, barbiturates, hallucinogens, or amphetamines unless on the advice of a physician? ...................

b. chest pain, heart attack, high blood pressure, heart murmur, stroke, palpitation or any other disease of the heart, circulatory system or blood? ...............................

c. asthma, emphysema, bronchitis, or other respiratory disorders? ...............

d. jaundice, ulcer, intestinal bleeding, colitis, chronic diarrhea or other disorder of the liver, stomach, intestines or gall bladder? ........

e. disease of the kidney, bladder, prostate or reproductive organs or breast, urine abnormality or venereal disease? ...................

f. cancer, tumor, disorder of the skin or lymph glands? ...............................

g. Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC), or any other immunological disorder? .................

h. diabetes, thyroid, or other endocrine disorders?

i. loss of vision, amputation, deformity, arthritis or any disorder of the muscles, bones or joints? .

**4. Have you ever had, been told you had, or been treated for:**

a. dizziness, headaches, convulsions, epilepsy, paralysis, mental or nervous disorder? ......

**5. At any time during the past five years, have you consulted, been examined or treated by any physician or practitioner for reason(s) not stated in other answers? ........................**

**6. Details to "Yes" answers — Questions 3 through 5:**

| In Reply to Question | Name of Person | Illness or Nature of Complaint | Date of Onset | Date of Recovery | Doctor's Name & Address |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

I (We) represent that all statements and answers made in all parts of this application are full, complete and true to the best of my (our) knowledge and belief. It is agreed that:

(1) All such statements and answers shall be the basis for and a part of any policy issued on this application.

(2) No agent or medical examiner can accept risks or make or change contracts or waive First Penn-Pacific's rights or requirements.

(3) No insurance shall take effect unless the Proposed Insured(s) is (are) alive and in the same condition of health as described in this application when the policy is delivered to the Owner and the initial premium is paid. However, if the initial premium is paid as set forth in the attached Conditional Receipt and this Receipt is delivered to the Owner, the terms of this Receipt shall apply.

(4) Acceptance of a policy by the Owner shall constitute ratification of any changes made by First Penn-Pacific under "Home Office Endorsements." In those states where it is required, changes in plan of insurance, amount, age at issue, classification of risks or benefits will be made only with the Owner's consent.

The Proposed Insured(s) hereby authorizes any licensed physician, medical practitioner, hospital, clinic, Veterans Administration, or other medical or medically related facility, insurance company, the Medical Information Bureau or other organization, institution or person, that has any records or knowledge of me or my health, to give to First Penn-Pacific Life Insurance Company or its reinsurers any such information.

The Proposed Insured(s) also acknowledges receipt of the notices required by the Federal Fair Credit Reporting Act and Medical Information Bureau. A photographic copy of this authorization/acknowledgement shall be as valid as the original.

Signed at _Chicago_  _City_  _State_ 312 432 1866  Date _8_ _19_ _97_  Month  Day  Year

_Witness — Agent_

Agent Phone No. ____

_Signature of Proposed Insured_ Thomas a. Suronski

| For Home Office Endorsement Only | |
|---|---|
| | Signature of Applicant (Owner). If applicant is a corporation or partnership, print name of company on line above |
| | Signature and Title of Officer Signing for Applicant Company |



**FIRST PENN-PACIFIC LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

## SUPPLEMENT TO APPLICATION

---

### IMPORTANT NOTICE

The insurance being applied for with this application is not approved for Medicaid Asset Protection under the Illinois Long-Term Care Partnership Program. However, this insurance is an approved traditional Long-Term Care Rider under State Insurance Regulations. For information about policies and certificates approved under the Illinois Long-Term Care Partnership Program, call the Senior Helpline at the Department on Aging at: 1-800-252-8966.

---

Proposed Insured: _Thomas A. Iwanski_    Birth Date: _____

| | YES | NO | **Details to "Yes" Responses for Questions 1-9 (Identify Question Number)** |
|---|---|---|---|
| 1. Do you have any impairment, whether mental or physical, for which you need or receive assistance or supervision in performing everyday living activities such as dressing, eating, bathing, locomotion, or bowel or bladder control? . . . . . . . . | | | |
| 2. Do you use a wheelchair, walker or cane, oxygen, catheter, dialysis machine, or other mechanical device? . . . . . . . . . . | | | |
| 3. Have you received a medical diagnosis within the past five years under which you were advised to have any surgical operation which has not yet been performed? . . . . . . . . . . | | | |
| 4. Within the past five years, have you been confined to a nursing home or sanitarium or recommended admission to same? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | |
| 5. Are you currently confined to a hospital or nursing facility? . | | | |
| 6. In the past five years, have you received home health care? | | | |
| 7. Have you ever been rejected or rated for nursing care or home health care coverage? . . . . . . . . . . . . . . . . . . . . . . . | | | |
| 8. Are you currently covered by Medicaid? . . . . . . . . . . . . . . | | | |

9. Do you currently have, or within the last twelve months have you had, any long term care policies or riders (including healthcare service or health maintenance organization contracts) in force or pending? (If yes, please list below.)

| Company Name | Max. Daily Benefit | Home Health Care Yes No | To Be Replaced Yes No | In Force Yes No |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

---

**Caution:** If your answers on this Supplemental Application are incorrect or untrue, the company may have the right to deny benefits or rescind your policy.

I hereby declare that the statements and answers to the above questions are complete and true to the best of my knowledge and belief. I agree that a copy of this Supplemental Application shall be attached to and form a part of any policy issued.

Dated At: _Chicago    IL_    On: _8_    _19_    _97_
     City     State           Month    Day    Year

Witness: _____    _Thomas A. Iwanski_
                                    Signature of Proposed Insured

---

Executive Office:    1801 South Meyers Road    Oakbrook Terrace, Illinois 60181-5214    (630) 495-3336

L-2840IL (7/95)

**PART TWO OF APPLICATION TO FIRST PENN-PACIFIC LIFE INSURANCE COMPANY**

1801 South Meyers Road  •  Oakbrook Terrace, Illinois 60181  •  (708) 495-3336

190193

---

**1. PROPOSED INSURED**                                                                 Social Security No.

Full name _Thomas_ _A_ _IWANSKI_      Date of Birth
            First        M.I.        Last            Month   Day   Year

---

**2. Have you ever had or ever been treated for:**                                        YES    NO

a. High blood pressure, chest pain, irregular heart rhythm, palpitations, heart murmur, heart attack, angina, phlebitis, peripheral vascular disease, or any other disease or disorder of the heart or blood vessels? . . .

b. Epilepsy, convulsions, fainting spell, stroke, paralysis, head injury, or other disease or disorder of the brain or nervous system? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

c. Diabetes or any other disease or disorder of the pituitary, thyroid, or endocrine glands? . . . . . . . . . . . . .

d. Cancer, tumor, leukemia, lymphoma, or any other malignant disorder? . . . . . . . . . . . . . . . . . . . . . . . . .

e. Cancer, tumor, leukemia, lymphoma, or any other malignant disorder? . . . . . . . . . . . . . . . . . . . . . . . . .

f. Disorder or disease of the blood, including anemia, polycythemia, leukopenia, clotting disorder, immune disorder (congenital or acquired), or platelet disorder? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

g. Cyst, polyp, lump, or other growth, or any disorder of the breast, skin, or lymph nodes? . . . . . . . . . . . . .

h. Asthma, bronchitis, emphysema, pneumonia, sarcoidosis, sleep apnea, tuberculosis, shortness of breath, or other lung or respiratory ailment? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

i. Hepatitis, ulcer, internal bleeding, colitis, or any other disease or disorder of the stomach, esophagus, liver, pancreas, spleen, intestines, colon, or rectum? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

j. Albumin, blood or sugar in the urine or any other disease or disorder of the kidney, bladder, prostate, or reproductive system? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

k. Arthritis or any other disease or disorder of the muscles, connective tissues, or bones? . . . . . . . . . . . . . .

l. Anxiety, depression, or other mental or nervous disorder? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

m. Any disease or disorder of the eyes, ears, nose, or throat? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

**3. a.** Have you **ever** used any form of tobacco or nicotine-based products? . . . . . . . . . . . . . . . . . . . . . . . . . . .

**b.** If "Yes", when did you last use tobacco or nicotine-based products?

Type _____  Quantity _____        Month/ Year

---

**4. Have you ever:**                                                                     YES    NO

a. Used heroin, cocaine (including crack), LSD, PCP, amphetamines, barbiturates, any derivative of these drugs, or any other controlled substance except as prescribed by a physician? . . . . . . . . . . . . . . . . . . . . .

b. Received or been advised to receive treatment or counseling for alcohol or drug use by a physician, psychiatrist, or psychologist? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

c. Been advised by a physician, psychiatrist, or psychologist to quit or reduce your alcohol use? . . . . . . . . .

d. Been a member of Alcoholics Anonymous (AA) or Narcotics Anonymous (NA)? . . . . . . . . . . . . . . . . . . .

e. Been convicted of drug possession or distribution? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

**5. Details of Items 2 through 4.** Give complete details of all "Yes" answers. Identify question number and include diagnoses, dates
Question |                              durations, treatments and medications prescribed, and names/addresses of all physicians
No.      |                              psychiatrists, psychologists, and hospitals. *Use #13 on reverse side, if additional space needed.*

---

BL-2001AA (6/95)

| 6. **Family Record** | Age(s) if living | Age(s) at Death | Cause of Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Brothers and Sisters | | | |

7. Has any family member listed in Number 6 had cancer, diabetes, high blood pressure, heart disease, or kidney disease? If "YES", identify family member, disorder, age of onset. If there is a history of cancer, indicate kind(s) of cancer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **YES    NO**

8. At any time during the past five years have you been hospitalized or have you consulted, been examined or treated by any other physician, psychiatrist, or medical practitioner not disclosed in response to Questions 2 through 4? If "YES", list all occurrences and provide name(s)/address(es), dates, and reasons. . . . . . . . . . . . . . . . . . . . .

9. Have you:
   a. Been advised, in the last two years, to have any diagnostic test, surgery, or hospitalization which has not been completed? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   b. Have you ever been treated for dizziness, headaches, tremors, muscle weakness, persistent hoarseness or cough, or coughing up blood? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   c. Have you been diagnosed or treated by a member of the medical profession as having AIDS, ARC, or the HIV infection? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   d. Ever received any sickness or disability pension, benefits, or compensation? . . . . . . . . . . . . . . . . . . . . . .
   e. Ever attempted suicide or sought counseling for suicide-prevention or for thoughts about suicide? . . . . . .
   f. Any mental or physical disorder not listed in response to Questions 2 through 9? . . . . . . . . . . . . . . . . . . .

10. Are you currently taking or have you been advised to take any medication? . . . . . . . . . . . . . . . . . . . . . . . . . .
    If "YES", list name of medication, reason, and doctor's name and address.

11. What is your height? _____ Weight? _____ Have you lost weight in the past year? . . . . . .
    If "YES", provide amount of weight loss and reason in Number 13.

12. Who is your personal physician? *If none, state none.*
    Name _____
    Street _____
    City _____ State _____ Zip _____
    Phone No. ( ) _____ Date last seen? _____
    Why? _____ Results? _____
    What tests were made? _____ Were the results normal? *(If no, give details below.)*

13. **Details of Items 7 through 12.** Give complete details for all "Yes" answers. Identify question number and include diagnoses,
    Question      dates, durations, treatments and medications prescribed, and names/addresses of all
    No.           physicians, psychiatrists, psychologists, and hospitals. Use #5, if additional space needed.

All statements and answers to the foregoing questions in this Part Two application are, to the best of my knowledge and belief, true, complete, and correctly stated. I agree that a copy of this Part II shall be attached to and form part of any policy issued based on my application.

Dated at _____ _Chicago_ _____ On _8/15/97_
                        City                State          Month/Day/Year

X _Thomas a. Swarski_                    Signature of Witness          Examiner ☐ Agent
Signature of **Proposed Insured**

BL-2001AA (6/95)                                                       Page 2

# FIRST PENN-PACIFIC LIFE INSURANCE CO.

A part of LINCOLN NATIONAL CORPORATION

Fort Wayne, Indiana
Executive Office: 1801 South Meyers Road • Oakbrook Terrace, Illinois 60181-5214 • (630) 495-3336

## CONVALESCENT CARE BENEFITS RIDER
### (Adult Day Care, Home Health Care and Nursing Home Care Benefits)

*This rider prepays the Death Benefit provided by the policy to cover Adult Day Care, Home Health Care and Nursing Home Care Expenses. This prepayment will be made at your option and will be subject to all of the conditions stated in this rider.*

---

### NOTICE TO OWNER

THIS RIDER MAY NOT COVER ALL OF THE COSTS ASSOCIATED WITH LONG-TERM CARE INCURRED DURING THE PERIOD OF COVERAGE. YOU ARE ADVISED TO CAREFULLY REVIEW ALL POLICY AND RIDER LIMITATIONS.

THIS RIDER IS NOT APPROVED FOR MEDICAID ASSET PROTECTION UNDER THE ILLINOIS LONG-TERM CARE PARTNERSHIP PROGRAM. HOWEVER, THIS RIDER IS AN APPROVED TRADITIONAL LONG-TERM CARE INSURANCE RIDER UNDER STATE INSURANCE REGULATIONS. FOR INFORMATION ABOUT POLICIES AND CERTIFICATES APPROVED UNDER THE ILLINOIS LONG-TERM CARE PARTNERSHIP PROGRAM, CALL THE SENIOR HELPLINE AT THE DEPARTMENT OF AGING AT 1-800-252-8966.

---

**TAXATION: This rider is intended to be a Qualified Long-Term Care Insurance contract under Section 7702B(b) of the Internal Revenue Code.**

**CAUTION: We issued this rider based on your and the Insured's answers to the questions on your application. A copy of your application is enclosed. If your answers or the Insured's answers are incorrect or untrue, we may deny benefits or rescind this rider. The best time to clear up any question is now, before a claim arises! If, for any reason, any of your answers or the Insured's answers are incorrect, contact us at the address shown above.**

**Right To Examine Rider For 30 Days.** Notwithstanding the *"Right To Examine Policy"* provision of the policy, you have the right to examine the policy and this rider for 30 days. If you are not satisfied for any reason, you may return the policy and this rider to us within 30 days after receipt. If returned, we will refund all of the premiums you have paid and the policy and this rider will be void from their issue dates. If this rider was applied for after the effective date of the policy and if you return it to us within 30 days after its receipt, we will credit to the Account Value of the policy any premium which may have been deducted for this rider and this rider will be void from its issue date.

**WE PROMISE TO PAY** the Adult Day Care, Home Health Care and Nursing Home Care benefits provided by this rider for *Qualified Long Term Care Services* if the Insured becomes *Chronically Ill* while this rider is in force. Our payment will be subject to all of the terms and conditions of this rider.

**Who is Covered.** This rider covers the primary Insured under the policy. It does not cover any other person.

**Renewability.** This rider is guaranteed renewable. We may not cancel or reduce coverage provided by this rider. Unless you request termination of this rider, this rider will remain in force for as long as the policy remains in force.

---

L-2800IL(1/97)                    Page 1

**Premiums.** We have issued this rider in consideration of the payment of the first premium and the statements made in the application.

The monthly premium for this rider is a specified percent of the monthly charge for the *"Basic Life Insurance".* The specified percent, which will not increase, is shown in the Policy Schedule next to the caption, "Convalescent Care Benefits Rider Premium Percent." The *Basic Life Insurance* is the amount of life insurance provided by the policy, excluding any additional life insurance added by rider. The method of computing the monthly charge for the Basic Life Insurance is explained in the policy under the heading "Cost of Insurance."

Each month we will deduct the premium for this rider from the Account Value of the policy. This will be done at the same time that we deduct the monthly charge for life insurance and other monthly charges under the policy.

**Effective Date.** If this rider is applied for in the application for the policy, the effective date of this rider will be the Policy Date of the policy. If it is added to the policy after the Policy Date, the effective date of this rider will be the date we approve the supplemental application.

## PART 1:    DEFINITIONS

*This part explains the meaning of special words and phrases that are used in this rider. In addition, special words and phrases that are used only in specific parts of this rider are defined in those parts.*

**Account Value** means the surrender value of the policy before deduction of any surrender charge. In some policies to which this rider may be attached, it is called the "Cash Value" or the "Accumulation Value." The calculation of the Account Value is explained in the policy.

**Benefit Period** means a period which begins with the first day that the Benefit Conditions

are met. (The Benefit Conditions are explained in Part 2 of this rider.) A Benefit Period ends when a period of 180 consecutive days elapses during which no benefits are payable. We will not count, as part of that 180 days, any days the Insured is confined in a legally operated hospital.

**Chronically Ill or Chronic Illness** means that the Insured has been certified, within the preceding 12 months, by a Physician as:

a. Being unable to perform (without substantial assistance from another individual) at least 2 *"Activities of Daily Living",* as defined below, for a period of at least 90 days due to loss of functional capacity; or

b. Requiring substantial supervision to protect the Insured from threats to health and safety due to *"Severe Cognitive Impairment"* as defined below.

In this definition, *"Activities of Daily Living"* mean 6 basic functional abilities which relate to the Insured's ability to live independently. They are:

a. *Bathing:* The Insured's ability to wash himself or herself in the tub or shower, or by sponge bath from a basin, with or without the aid of equipment.

b. *Continence:* The Insured's ability to maintain a reasonable level of personal hygiene in the control of bowel and bladder functions, either voluntarily or by effective use of special appliances or protective undergarments designed to collect body waste.

c. *Dressing:* The Insured's ability to put on or take off the garments he or she usually wears, as well as any medically necessary braces or artificial limbs, and to fasten and unfasten them.

d. *Eating:* The Insured's ability to get nourishment into his or her body by any means once it has been prepared and made available.

e. *Toileting:* The Insured's ability to maintain a reasonable level of personal hygiene by using a toilet, getting to and from the toilet, and getting on and off the toilet, with or without the aid of equipment.

f. *Transferring*: The Insured's ability to move in and out of a chair or bed with or without the aid of equipment (including support and other mechanical devices).

*"Severe Cognitive Impairment"* means deterioration or loss in the Insured's intellectual capacity as measured and confirmed by clinical evidence and standardized tests which reliably measure impairment in the following areas:

a. The Insured's short or long term memory;

b. The Insured's orientation as to person (such as who they are), place (such as their location), and time (such as day, date and year); and

c. The Insured's deductive or abstract reasoning.

Such loss in intellectual capacity can result from Alzheimer's disease or similar forms of irreversible loss of mental capacity.

**Death Benefit** means the Death Benefit of the policy, excluding additional death benefits added by rider. The Death Benefit is described in the policy.

**Immediate Family** means the Insured's spouse and the children, brothers, sisters and parents of either the Insured or the Insured's spouse.

**Insured** means the person who is the primary Insured under the policy. It does not include other persons covered by rider.

**Medicare** means the Health Insurance for the Aged Act, Title XVIII of the Social Security Amendments of 1965, as then constituted or later amended.

**Net Account Value** means the policy Account Value, less any policy loans against the policy.

**Net Death Benefit** means the policy Death Benefit, less any policy loans against the policy.

**Net Surrender Value** means the policy surrender value, less any policy loans against the policy.

**Physician** means any physician as defined in Section 1861(r)(1) of the Social Security Act, as then constituted or later amended.

**Qualified Long-Term Care Services** means necessary diagnostic, preventive, therapeutic, curing, treating, mitigating, and rehabilitative services, and *"Maintenance or Personal Care Services,"* as defined below, which are:

a. Required by the Insured because he or she is Chronically Ill; and

b. Provided pursuant to a plan of care prescribed by the attending Physician.

In this definition, *"Maintenance or Personal Care Services"* means any care the primary purpose of which is to provide needed assistance with any of the disabilities as a result of which the Insured is Chronically Ill or in need of protection from threats to health and safety due to Severe Cognitive Impairment.

**You and Your** means the Owner of the policy.

**We, Our and Us** means First Penn-Pacific Life Insurance Company.

---

**PART 2:    LIMITATIONS OR CONDITIONS ON ELIGIBILITY FOR BENEFITS**

*This part explains how the Insured becomes eligible for benefits and the benefit limitations.*

**Benefit Conditions.** The following conditions must be met to qualify for benefits under this rider:

a. The Insured must be Chronically Ill, as determined, and certified at least once every 12 months, by the attending Physician, and must incur care expense for care, covered by this rider, which begins while the policy and this rider are in force;

b. The care provided must constitute Qualified Long-Term Care Services and must be provided as a part of a plan of care, approved and reconfirmed in writing, at least once every 90 days, by the attending Physician; and

c. No portion of the policy Death Benefit can have been advanced under any other rider attached to the policy.

**Deductible Period.** This rider has a Deductible Period during which time this rider does not provide benefits. This Deductible Period applies to all benefits, except for the Care Planning Benefit and the Respite Care Benefits. This Deductible Period must be satisfied before benefits become payable.

The Deductible Period may be satisfied only by days during which benefits would otherwise be payable under this rider. The Deductible Period is shown in the Policy Schedule.

Adult Day Care, Home Health Care and Nursing Home Care are often received on an intermittent basis. For this reason, we do not require that a Deductible Period be consecutive days. We do require, however, that a Deductible Period be satisfied within a specified time span. This time span is equal to 3 times the length of the Deductible Period. For example, a Deductible Period of 90 days is satisfied by 90 days of care occurring within a 270 day period.

**Reinstatement of Deductible Periods.** Because care is frequently received on an intermittent basis, it is not necessary to satisfy a new Deductible Period each time care stops and begins again. A new Deductible Period is required only when a period of 180 consecutive days expires during which no benefits are payable. We will not count, as part of that 180 days, any days the Insured is confined in a legally operated hospital.

**Daily Maximum.** The Daily Maximum is the maximum amount we will pay for covered expense incurred during any one day. There is a separate Daily Maximum for Adult Day Care, for Home Health Care, and for Nursing Home Care. If the Insured should incur more than one type of covered expense during any one day, we will pay for all of the covered expense incurred during that day, but not more than the Daily Maximum that provides the largest benefit.

The Daily Maximums, as of the Effective Date of this rider, are shown in the Policy Schedule. These amounts may be changed as provided in the "Changes to the Daily Maximums" provision found in Part 9 of this rider.

**Benefit Limit.** The Benefit Limit is the maximum amount of benefits which may be paid under this rider. The Benefit Limit equals the Death Benefit of the policy. If the policy includes a term rider providing an additional death benefit, this additional term rider death benefit is disregarded in computing the Benefit Limit of this rider.

The Benefit Limit, as of the Effective Date of this rider, is shown in the Policy Schedule. It may be changed as provided in the "Changes to Benefit Limit" provision found in Part 9 of this rider.

## PART 3:  PERSONAL CARE ADVISOR AND CARE PLANNING BENEFIT

*This part introduces the Personal Care Advisor. If you're confused or if you just want to talk to a person who can explain this rider and answer your questions about benefits, call your Personal Care Advisor. This is an optional service which is available to you at no cost. Although you are not required to use this service, it may be to your advantage to do so. This part also describes the Care Planning Benefit which can assist in developing and coordinating your plan of care.*

**Personal Care Advisor.** We will provide you with a Personal Long Term Care Advisor. You may contact your Personal Long Term Care Advisor at any time in order to:

a. Discuss which types of care may be covered under this rider; and

b. Know in advance if a particular provider of service, such as a Nursing Home or Home Health Care Agency, meets rider conditions.

To receive the services of your Personal Long Term Care Advisor, you or the Insured's physician should call the Personal Long Term Care Advisor's Office. The toll-free number of the Personal Long Term Care Advisor's Office is shown in the Policy Schedule.

**Care Planning Benefit.** We will pay the expense incurred for Care Planning provided by a Care Planning Agency to the extent that such services are covered as Qualified Long-Term Care Services, but not to exceed the Care Planning Benefit per calendar year. The Care Planning Benefit is shown in the Policy Schedule.

The Deductible Period does not apply to this benefit; nor may this benefit be used to satisfy the Deductible Period. The benefit, however, does apply towards the Benefit Limit and is subject to all conditions provided under Part 2 of this rider.

*"Care Planning"* means the following services provided to the Insured by a Care Planning Agency:

a. The assessment of the circumstances in the Insured's home which relate to his or her ability to live independently;

b. The assessment of the degree of the Chronic Illness and the level of assistance needed for each Activity of Daily Living or because of the Severe Cognitive Impairment;

c. The preparation of a plan of care for the Insured;

d. of services and the monitoring of the delivery of such services; and

e. The monitoring of any changes in the Insured's abilities and the updating of the plan of care when appropriate.

*"Care Planning Agency"* means an agency or an organization which primarily engages in Care Planning on behalf of its clients. It is state licensed, if the state in which it operates licenses Care Planning Agencies, and it is operating within the scope of its license. If the state in which it is operating does not license Care Planning Agencies, the agency must meet the following criteria:

a. It must operate at least 5 days per week for a minimum of 8 hours per day and have someone on call to provide emergency coverage during non-operating hours;

b. It must have at least one full-time Nurse and one full-time social worker on staff; and

c. It must maintain a written record for each client which includes a record of all services provided.

---

## PART 4:   ADULT DAY CARE, HOME HEALTH CARE AND RESPITE CARE BENEFITS

---

*This part explains the Adult Day Care, Home Health Care and Respite Care Benefits provided by this rider to a Chronically Ill Insured.*

**Adult Day Care Benefits.** Subject to the Deductible Period, we will pay the expense incurred for Adult Day Care during a Benefit Period, but not to exceed the Daily Maximum per day for Adult Day Care, nor the Benefit Limit.

The Daily Maximum per day for Adult Day Care and the Benefit Limit are shown in the Policy Schedule.

*"Adult Day Care"* means Qualified Long-Term

Care Services provided by an Adult Day Care Center during any part of the day on less than a 24 hour basis.

*"Adult Day Care Center"* means an organization which is state licensed, if the state in which it is located licenses adult day care centers. If the state does not license Adult Day Care Centers, the center must meet all of the following criteria:

a. Be operated as an Adult Day Care Center;

b. Be operated at least 5 days a week for a minimum of 5 hours per day and is not an overnight facility;

c. Maintains a written record for each client which includes a plan of care prescribed by a Physician and a record of all services provided;

d. Have established procedures for obtaining appropriate aid in the event of a medical emergency;

e. Have formal arrangements for providing services of: a dietitian; a licensed physical therapist; a licensed speech therapist; and a licensed occupational therapist; and

f. Have on its staff all of the following: a full-time director; one or more nurses in attendance during operating hours for at least 4 hours a day; and enough full-time staff members to maintain a client-to-staff ratio of 8 or less to 1.

**Home Health Care Benefits.** Subject to the Deductible Period, we will pay the expense incurred for Home Health Care during a Benefit Period, but not to exceed the Daily Maximum per day for Home Health Care, nor the Benefit Limit.

The Daily Maximum per day for Home Health Care and the Benefit Limit are shown in the Policy Schedule.

*"Home Health Care"* means Qualified Long-Term Care Services provided by a Home Health Care Agency at the Insured's place of residence, outside of a hospital or a Nursing

Home, because the Insured is Chronically Ill. Home Health Care may include, but shall not be limited to, the services of a nurse, a licensed physical therapist, a licensed occupational therapist, a licensed speech therapist or audiologist, a licensed chemotherapy specialist, and a home health aide or a personal care attendant, as well as, homemakers services, maintenance and personal care services, and hospice care, to the extent that they are Qualified Long-Term Care Services.

*"Home Health Care Agency"* means an entity which provides care and services at the Insured's home or other residence, is primarily engaged in providing residential health care services under policies and procedures established by a group of professionals, including at least one physician and one nurse, and meets at least one of the following criteria:

a. Is licensed by the appropriate licensing agency as a Home Health Care Agency; or

b. Is accredited as a Home Health Care Agency or as a provider of Home Health Care Services by the National League of Nursing, American Public Health Association or Joint Commission on Accreditation of Health Care Organizations or their successor organization ;or

c. Is certified by Medicare as a Home Health Care Agency.

**Respite Care Benefits.** We will pay the expense incurred for Respite Care during a Benefit Period, but not to exceed the Daily Maximum per day for Home Health Care, 21 days per calendar year, nor the Benefit Limit. This benefit is not subject to the Deductible Period.

The Daily Maximum per day for Home Health Care is shown in the Policy Schedule.

*"Respite Care"* means temporary Qualified Long-Term Care Services provided in an institution, in the home, or in a community-

based program that are needed to temporarily relieve the person or persons, often members of the Insured's immediate family, who provide ongoing daily care to the Insured while the Insured resides outside of a hospital or a Nursing Home.

## PART 5:    NURSING HOME BENEFITS

*This part explains the Nursing Home Benefits provided by this rider to a Chronically Ill Insured.*

**Nursing Home Care Benefits.** Subject to the Deductible Period, we will pay the expense incurred by the Insured for Qualified Long-Term Care Services in a Nursing Home during a Benefit Period, but not to exceed the Daily Maximum per day for Nursing Home Care, nor the Benefit Limit.

The Daily Maximum per day for Nursing Home Care and the Benefit Limit are shown in the Policy Schedule.

*"Nursing Home"* means a facility or distinctly separate part of a hospital or other institution which is licensed by the appropriate state licensing agency as a Nursing Home, if the state licenses such facilities. If the state does not license Nursing Homes, then the facility must meet all of the following criteria:

a. It must provide 24 hour a day nursing service under a planned program of policies and procedures which were developed with the advice of, and is periodically reviewed and executed by, a professional group of at least one physician and one nurse;

b. It must have a physician available to furnish medical care in case of emergency;

c. It must have at least one nurse who is employed there full time (or at least 24 hours per week if the facility has less than 10 beds);

d. It must have a nurse on duty or on call at all times;

e. It must maintain clinical records for all patients; and

f. It must have appropriate methods and procedures for handling and administering drugs and biologicals.

*NOTE    These criteria are typically met by licensed skilled nursing facilities, comprehensive nursing care facilities and intermediate nursing care facilities as well as some specialized wards, wings and units of hospitals. They are generally NOT met by assisted living facilities, rest homes, homes for the aged, sheltered living accommodations, residence homes, or similar living arrangements.*

**Levels of Care.** This rider makes no distinction, either in the duration or amount of benefits you will be paid, for different levels of care (whether skilled, intermediate or custodial) as long as the Insured's stay in a Nursing Home meets the Nursing Home definition listed above.

## PART 6:    BENEFIT DURATION

*This part explains the conditions under which benefits may be available after this rider lapses.*

Benefits will be paid as long as the Benefit Conditions are met and the Benefit Limit has not been reached. The Benefit Conditions and the Benefit Limit are described in Part 2 of this rider.

If the policy and this rider should lapse without value after a Benefit Period begins, the Insured will continue to be eligible for benefits provided by this rider subject to the following conditions:

a. The Insured's eligibility for benefits will end if a period of 30 consecutive days elapses during which neither Adult Day Care Benefits, Home Health Care Benefits, nor Nursing Home Care Benefits are payable. We will not count as part of that 30 days, any days the Insured is confined in a legally operated hospital; and

b. We will not pay benefits in excess of those we would have paid had this rider remained in force.

To be eligible for the full range of policy and rider benefits after a Benefit Period begins, you should keep the policy and this rider in force. The Grace Period provision of the policy explains the notice we will provide to you should additional premium be required to keep the policy and this rider in force.

## PART 7:    ALZHEIMER'S DISEASE

This rider will cover Qualified Long-Term Care Services resulting from a clinical diagnosis of Alzheimer's Disease or similar forms of irreversible loss of mental capacity. Any exclusion contained in this rider for mental disorders does not apply to these conditions.

## PART 8:    GENERAL    EXCLUSIONS    AND LIMITATIONS

*This part explains when benefits will not be paid, even if you are otherwise entitled to payment under another part of this rider.*

**Losses Not Covered.** This rider will not pay benefits for:

a. Treatment resulting from mental or nervous disorders which include neurosis, psychoneurosis, psychopathy, psychosis, or mental or emotional diseases or disorders without demonstrable organic origin. This rider will, however, cover qualifying stays or care resulting from Alzheimer's Disease or similar forms of irreversible loss of mental capacity as explained in Part 7 above;

b. Treatment for alcoholism, drug addiction or chemical dependency (unless the drug addiction or chemical dependency is a result of medication prescribed by a physician);

c. Treatment arising out of an attempt (while

sane) at suicide or an intentionally self-inflicted injury;

d. Treatment provided in a Veteran's Administration or government facility, unless the Insured or the Insured's estate is charged for the confinement or services or unless otherwise required by law;

e. Loss to the extent that benefits are payable under any of the following: Medicare (including that which would have been payable but for the application of a deductible or a coinsurance amount), other governmental programs (except Medicaid), workers compensation laws, employer's liability laws, occupational disease laws, and motor vehicle no-fault laws;

f. Confinement or care received outside the United States;

g. Services provided by a facility or an agency that does not meet the rider definition of an Adult Day Care Center, Home Health Care Agency or Nursing Home; and

h. Services provided by a member of your Immediate Family or for which no charge is normally made in the absence of insurance.

## PART 9:    EFFECT OF RIDER BENEFITS ON POLICY VALUES

*This part explains how the payment of the rider benefits affects the Death Benefit and the Account Value of the policy.*

**Death Benefit During Benefit Period.** Death Benefit Option 1 will be in effect for the duration of any Benefit Period. If at the beginning of a Benefit Period, Death Benefit Option 2 is in effect, then we will change it to Death Benefit Option 1. The effective date of the change will be the date corresponding to the beginning of the Benefit Period. Death Benefit Options 1 and 2 are explained in the policy.

**Waiver of Surrender Charge.** Any policy surrender charge which would otherwise be applicable, will be waived during a Benefit Period and will not be reinstated at the end of the Benefit Period. Waiver of the policy surrender charge will make the Net Surrender Value equal to the Net Account Value.

**Death Benefit Reduction.** Each rider benefit payment will reduce the Death Benefit payable under the policy by a like amount. Rider benefit payments will not reduce the death benefit payable under any term rider attached to the policy.

**Account Value Reduction.** Each rider benefit payment will reduce the policy Account Value by an amount equal to (a) times (b) divided by (c), where;

(a) is the Net Account Value immediately prior to the benefit payment;

(b) is the rider benefit payment; and,

(c) is the Net Death Benefit immediately prior to the benefit payment.

**Changes to Daily Maximums.** Reductions to the Net Death Benefit resulting directly from rider benefit payments will *not* cause a reduction in Daily Maximums. Reductions to the Net Death Benefit resulting from your exercise of your rights under the policy, including your right to make policy loans and partial surrenders, will cause a reduction in Daily Maximums. The reduction in Daily Maximums will be proportional to the reduction in the Net Death Benefit. For example, if you make a partial surrender which causes the Net Death Benefit to be reduced by 5%, then Daily Maximums will concurrently be reduced by 5%.

Similarly, policy loan repayments and increases to the Death Benefit will cause Daily Maximums to increase. The increase in Daily Maximums will be proportional to the increase in the Net Death Benefit. For example, if your repayment of a policy loan causes the Net Death Benefit to be increased by 10%, then Daily Maximums will concurrently be increased by 10%.

A change to Daily Maximums will apply to covered losses incurred on or following the date of the change. A change to Daily Maximums will not apply to covered losses incurred prior to the date of the change.

**Changes to Benefit Limit.** Reductions to the Net Death Benefit resulting directly from rider benefit payments will *not* cause a reduction in the Benefit Limit. Reductions to the Net Death Benefit resulting from your exercise of your rights under the policy, including your right to make policy loans and partial surrenders, will cause a reduction in the Benefit Limit. The reduction in the Benefit Limit will equal the reduction in the Net Death Benefit. For example, if you make a partial surrender which causes the Net Death Benefit to be reduced by $500, then the Benefit Limit will concurrently be reduced by $500.

Similarly, policy loan repayments and increases to the Death Benefit will cause the Benefit Limit to increase. The increase in the Benefit Limit will equal the increase in the Net Death Benefit. For example, if your repayment of a policy loan causes the Net Death Benefit to be increased by $1000, then the Benefit Limit will concurrently be increased by $1000.

## PART 10:   CLAIMS

*This part explains the procedure for filing a claim. It also explains how we pay benefits; and other rights and obligations under this rider.*

**Notice of Claim.** You must tell us in writing when you have a claim for benefits. Notice should be given to us at our Executive Office. We must receive the notice within 60 days of the date the covered loss starts or, if later, as soon as reasonably possible. The notice should include at least:  your name, the Insured's name, your Policy Number and the

address to which the Claim Form should be sent. You may authorize someone else to act for you in filing a claim.

**Proof of Loss.** When we receive notice of your claim, we will send you a Claim Form to be used to file Proof of Loss.

The Claim Form has instructions on how to fill it out and where to send it. Please read the form carefully. Answer all questions and send all required information to the address on the form. You may contact your Personal Long Term Care Advisor (see Part 3 of this rider) if you have questions.

If you or your representative do not receive the Claim Form within 15 days after you send your Notice of Claim, a claim can be filed without it by sending us a letter which describes the occurrence, the character and the extent of the loss for which claim is made. That letter must be sent to us within the time period stated in the next paragraph. At a minimum, the description should tell us such things as: your name and address; the type of benefits you are claiming; the names and addresses of the Insured's physicians; the places the Insured stayed; the Insured's diagnosis; and the periods for which you are claiming benefits.

**Claim for Continuing Loss.** We must receive written Proof of Loss within 90 days after the end of each month for which benefits may be paid. If it was not reasonably possible to give us written Proof of Loss in the time required, we will not reduce or deny a claim for being late if Proof of Loss is filed as soon as reasonably possible. Unless the claimant is not legally capable, the required Proof of Loss must always be given to us no later than 1 year from the time specified.

**Time of Payment of Claim.** After we receive the proper written Proof of Loss, we will pay any benefits then due:

a. Monthly, when the loss is expected to result in on-going benefits; and

b. Immediately, or upon termination of our liability, when the loss in not expected to continue.

If a claim is not paid within 30 days after our receipt of the proper written Proof of Loss we will, in addition to the claim payment, pay interest at the rate required by the applicable laws of your state, if any, but not less than 6% per year.

If we do not pay a claim when due, you may bring an action to recover such benefits, and any other damages, as allowed by law.

**Payment of Claims.** If you are the Insured, we will pay the benefits to you, if living, otherwise to the policy Beneficiary. If you are not the Insured, we will pay the benefits to you, if living, otherwise to your estate. However, you may request in writing for payments to be made otherwise. You should make this request no later than the time you file Proof of Loss.

We will send you a monthly statement showing the amount of benefits we paid. This statement will also show the effect of such payment on the policy Death Benefit and Account Value as well as the remaining amount of rider benefits available.

**Claim Review, Recertification and Physical Examination.** We will periodically review the extent of the Insured's Chronic Illness, or have a third party professional organization do so on our behalf. We may also have a physical examination performed, at our expense, by a medical practitioner of our choice.

We will ask the attending Physician, who provided us with the initial assessment and certification, to provide us with a current written assessment and a recertification of the Insured's condition at least once every 12 months. The review, recertification and any physical examination will be requested solely for the purpose of determining whether the Insured's condition and treatment qualify for benefits under the terms of this rider.

Claim Appeal.

**Claim Appeal.** We will inform you in writing if a claim or any part of a claim is denied.

We will evaluate your claim based on this rider and the information given to us. If you do not agree with a claim decision, you may then ask for a review. Your request must be in writing and include any information you think will help your claim. No special form is needed. Your request should be sent to our Executive Office within 3 years after the time for filing the Proof of Loss. Within 30 days after receiving your request, we will send you or your representative our decision. Our decision will be in writing with our reasons stated clearly. You may authorize someone else to act for you under this review procedure.

**Misstatement of Age.** If the Insured's age has been misstated, rider benefits will be those that the most recent premium would have purchased at the correct age. If coverage would not have been issued, we will refund the premium paid for this rider.

**Legal Actions.** You cannot sue or bring legal action before 60 days after written Proof of Loss has been given to us, as required by this rider. You cannot sue after the greater of the expiration of the applicable statute of limitations for your state or 3 years from the time written Proof of Loss is required to be given.

## PART 11:    THE CONTRACT

*This part explains other important rules and conditions which will affect this rider.*

**Termination of Rider.** This rider terminates:

a.  Upon your written request;

b.  When the Benefit Limit is reached;

c.  Upon the payment or advance of any part of the Death Benefit as a benefit under any provision of the policy or any rider other than this rider; or

d.  Upon termination of the policy.

However, if the policy and this rider lapse without value after a Benefit Period begins, we will continue the benefits provided by this rider subject to the conditions stated in Part 6.

**Reinstatement.** If the policy to which this rider is attached is reinstated, then this rider may also be reinstated. The reinstatement of this rider shall be subject to evidence of good health and insurability satisfactory to us. The reinstated rider will only provide benefits for care or confinement which begins after the date of reinstatement and will be subject to all conditions in the rider.

If, however, the Insured was Chronically Ill when this rider lapsed and, if the reinstatement is requested within 5 months after the date of the lapse, then in lieu of submitting evidence of good health and insurability, this rider may be reinstated by submitting to us a statement from the attending Physician certifying that the Insured is Chronically Ill as defined by this rider. The reinstated rider will provide benefits for care or confinement which begins after the date of the lapse and will be subject to all conditions in the rider not inconsistent herewith.

**Representations.** In the absence of fraud, any statement made by you or the Insured will be deemed a representation and not a warranty. Such statement may not be used in defense of a claim, unless it is contained in a signed, written application.

**Incontestability Period.** A misstatement by the Insured in any application for the policy or this rider may be used to void or cancel this rider. During the first 6 months following the effective date of this rider, we may take this action only if the misstatement was material to the issuance of this rider. After the first 6 months, but before the end of the first 24 months, we may take this action only if the misstatement was material to both the issuance of this rider and the claim for which benefits are being sought. After this rider has been in force for 24 months, we can take this action only if we can show that the Insured

knowingly and intentionally misrepresented relevant facts relating to his or her health. No benefits will be paid under this rider if it is voided or canceled.

**Pre-existing Conditions Not Excluded.** We will **not** deny benefits for Pre-existing Conditions. *"Pre-existing Conditions"* are physical or mental conditions which existed when you applied for this rider. This provision does not preclude us from exercising other remedies available to us under this rider because of misrepresentation.

**Conformity With State and Federal Statutes.** If any provision of this rider is in conflict with the statutes of the state in which the Insured resides on the rider Effective Date or with the Federal statutes which pertain to Qualified Long-Term Care Insurance contracts, the rider provision is automatically amended to meet the minimum requirements of the state or Federal statute.

**General Provision.** This rider shall be subject to all the terms and conditions of the policy which are not inconsistent herewith.

Signed by the Company at Oakbrook Terrace, Illinois.

Secretary

President



**FIRST PENN-PACIFIC LIFE INSURANCE CO.**

A part of LINCOLN NATIONAL CORPORATION

Fort Wayne, Indiana

Executive Office: 1801 South Meyers Road • Oakbrook Terrace, Illinois 60181-5214 • (630) 495-3336

# EXTENSION OF CONVALESCENT CARE BENEFITS RIDER
### (Extending Convalescent Care Benefits)

*This rider extends the benefits provided by the Convalescent Care Benefits Rider. The benefits of this rider become effective after the benefit payments under the Convalescent Care Benefits Rider end because the payments reduced the policy Death Benefit to zero.*

---

### NOTICE TO OWNER

THIS RIDER MAY NOT COVER ALL OF THE COSTS ASSOCIATED WITH LONG-TERM CARE INCURRED DURING THE PERIOD OF COVERAGE. YOU ARE ADVISED TO CAREFULLY REVIEW ALL POLICY AND RIDER LIMITATIONS.

THIS RIDER IS NOT APPROVED FOR MEDICAID ASSET PROTECTION UNDER THE ILLINOIS LONG-TERM CARE PARTNERSHIP PROGRAM. HOWEVER, THIS RIDER IS AN APPROVED TRADITIONAL LONG-TERM CARE INSURANCE RIDER UNDER STATE INSURANCE REGULATIONS. FOR INFORMATION ABOUT POLICIES AND CERTIFICATES APPROVED UNDER THE ILLINOIS LONG-TERM CARE PARTNERSHIP PROGRAM, CALL THE SENIOR HELPLINE AT THE DEPARTMENT OF AGING AT 1-800-252-8966.

---

**TAXATION:** This rider is intended to be a Qualified Long-Term Care Insurance contract under Section 7702B(b) of the Internal Revenue Code.

**CAUTION:** We issued this rider based on your and the Insured's answers to the questions on your application. A copy of your application is enclosed. If your answers or the Insured's answers are incorrect or untrue, we may deny benefits or rescind this rider. The best time to clear up any question is now, before a claim arises! If, for any reason, any of your answers or the Insured's answers are incorrect, contact us at the address shown above.

**Right To Examine Rider For 30 Days.** Notwithstanding the *"Right To Examine Policy"* provision of the policy, you have the right to examine the policy and this rider for 30 days. If you are not satisfied for any reason, you may return the policy and this rider to us within 30 days after receipt. If returned, we will refund all of the premiums you have paid and

the policy and this rider will be void from their issue dates. If this rider was applied for after the effective date of the policy and if you return it to us within 30 days after its receipt, we will credit to the Account Value of the policy any premium which may have been deducted for this rider and this rider will be void from its issue date.

**WE PROMISE TO PAY** the Adult Day Care, Home Health Care and Nursing Home Care benefits provided by this rider for *Qualified Long Term Care Services* if the Insured becomes *Chronically Ill* while this rider is in force. Our payment will be subject to all of the terms and conditions of this rider.

**Who is Covered.** This rider covers the primary Insured under the policy. It does not cover any other person.

**Renewability.** This rider is guaranteed renewable. We may not cancel or reduce coverage provided under this rider. Unless you request termination of this rider or the attached Convalescent Care Benefits Rider, this Extension of Convalescent Care Benefits

---

Rider will remain in force as long as the policy remains in force.

**Premiums.** We have issued this rider in consideration of the payment of the first premium and the statements made in the application, and in consideration of our issuing to you the Convalescent Care Benefits Rider as part of this policy.

The monthly premium for this rider is shown in the Policy Schedule. Each month we will deduct the premium for this rider from the Account Value of the policy. This will be done at the same time that we deduct the monthly charge for life insurance and the other monthly charges under the policy.

The monthly premium for this rider is guaranteed not to change.

**Effective Date.** If this rider is applied for in the application for the policy, the effective date of this rider will be the Policy Date of the policy. If it is added to the policy after the Policy Date, the effective date of this rider will be the date we approve the supplemental application.

## PART 1: BENEFITS

*This part explains the rider benefits and explains when they become payable.*

**Benefits.** This rider increases the Benefit Limit of the Convalescent Care Benefits Rider by the amount of the Additional Benefit Limit shown in the Policy Schedule. The Additional Benefit Limit becomes effective when the Benefit Limit of the Convalescent Care Benefits Rider is reached. In all other respects, the terms, exclusions and limitations of the Convalescent Care Benefits Rider governing the payment of benefits apply to this rider except as follows:

a. The benefits payable under this Extension of Convalescent Care Benefits Rider are subject to the Daily Maximums shown for this rider in the Policy Schedule. The Daily Maximums for this rider are not affected by any change in the Daily Maximums for the Convalescent Care Benefits Rider.

b. The Additional Benefit Limit provided by this rider is not affected by changes to the policy Net Death Benefit or by changes to the Benefit Limit of the Convalescent Care Benefits Rider.

c. Benefits will be paid under this rider for as long as:

   1. The Benefit Conditions of the Convalescent Care Benefits Rider are met; and

   2. The Additional Benefit Limit is not reached.

d. If the policy, the Convalescent Care Benefits Rider, or this rider lapse without value after a Benefit Period begins, you will continue to be eligible for benefits provided by this rider subject to the following conditions:

   1. The Insured's eligibility for benefits will end if a period of 30 consecutive days elapses during which neither Adult Day Care Benefits, Home Health Care Benefits, nor Nursing Home Care Benefits are payable. We will not count as part of that 30 days, any days the Insured is confined in a legally operated hospital; and

   2. We will not pay benefits in excess of those that we would have paid had this rider remained in force.

## PART 2: BENEFITS AFTER LAPSE

*This part explains the benefits which may be payable for covered expense which begins after the policy and this rider are lapsed.*

**Guaranteed Benefit.** After the policy and this rider have been in force for 3 years, this rider shall cover qualifying claims which begin after the policy and this rider are lapsed. This guaranteed benefit shall be payable in lieu of the benefit described in Part 1 of this rider.

The Daily Maximums payable for covered expense shall remain unchanged and shall be as shown in the Policy Schedule. The Additional Benefit Limit, however, shall be reduced to an amount equal to the greater of:

a. 30 times the Daily Maximum for Nursing Home Care; or

b. An amount equal to the total premium paid for this rider, including the premium, if any, waived under any waiver of premium provision of the policy.

In no event shall the Additional Benefit Limit provided under this part be greater than it would have been had the policy and this rider not lapsed and had remained in force.

The benefits provided under this part shall become effective on the same date that they would have become effective had the Convalescent Care Benefits Rider not lapsed. This would be on the date that the Convalescent Care Benefits Rider payments would have ended because the policy Death Benefit was reduced to zero.

## PART 3:   THE CONTRACT

*This part explains other important rules and conditions which will affect this rider.*

**Termination of Rider.** This rider terminates:

a. Upon your written request;

b. Upon termination of the policy or the Convalescent Care Benefits Rider, unless termination of the policy or the Convalescent Care Benefit Rider was the result of reaching the Benefit Limit in that rider; or

c. When the Additional Benefit Limit is reached.

However, even if the policy and the Convalescent Care Benefit Rider lapse without value, benefits may still be provided under Part 2 of this rider.

**Reinstatement.** If the policy to which this

rider is attached is reinstated, then this rider may also be reinstated. The reinstatement of this rider shall be subject to evidence of good health and insurability satisfactory to us. The reinstated rider will only provide benefits for care or confinement which begins after the date of reinstatement and will be subject to all conditions in the rider.

If, however, the Insured was Chronically Ill when this rider lapsed and, if the reinstatement is requested within 5 months after the date of the lapse, then in lieu of submitting evidence of good health and insurability, this rider may be reinstated by submitting to us a statement from the attending Physician certifying that the Insured is Chronically Ill as defined by this rider. The reinstated rider will provide benefits for care or confinement which begins after the date of the lapse and will be subject to all conditions in the rider not inconsistent herewith.

**Representations.** In the absence of fraud, any statement made by you or the Insured will be deemed a representation and not a warranty. Such statement may not be used in defense of a claim, unless it is contained in a signed, written application.

**Incontestability Period.** A misstatement by the Insured in any application for the policy or this rider may be used to void or cancel this rider. During the first 6 months following the effective date of this rider, we may take this action only if the misstatement was material to the issuance of this rider. After the first 6 months, but before the end of the first 24 months, we may take this action only if the misstatement was material to both the issuance of this rider and the claim for which benefits are being sought. After this rider has been in force for 24 months, we can take this action only if we can show that the Insured knowingly and intentionally misrepresented relevant facts relating to his or her health. No benefits will be paid under this rider if it is voided or canceled.

**Pre-existing Conditions Not Excluded.** We will *not* deny benefits for Pre-existing

Conditions. *"Pre-existing Conditions"* are physical or mental conditions which existed when you applied for this rider. This provision does not preclude us from exercising other remedies available to us under this rider because of misrepresentation.

**Conformity With State and Federal Statutes.** If any provision of this rider is in conflict with the statutes of the state in which the Insured resides on the rider Effective Date or with the Federal statutes which pertain to Qualified Long-Term Care Insurance contracts, the rider provision is automatically amended to meet the minimum requirements of the state or Federal statute.

**General Provision.** This rider shall be subject to all the terms and conditions of the policy which are not inconsistent herewith.

Signed by the Company at Oakbrook Terrace, Illinois.

Secretary

President



**FIRST PENN-PACIFIC**
**LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

Fort Wayne, Indiana
Executive Office: 1801 South Meyers Road • Oakbrook Terrace, Illinois 60181-5214 • (630) 495-3336

## GUARANTEED INSURABILITY RIDER

*This rider gives you a limited right to increase benefits provided on the life of the
primary Insured under your life insurance policy and Convalescent Care Benefits Riders
without providing us evidence of good health.*

**YOU HAVE THE OPTION OF PURCHASING
ADDITIONAL INSURANCE** on the life of the
primary Insured without providing us evidence
of good health. This option may only be
exercised on an Option Date, as described
below, and will be subject to all the terms and
conditions of this rider.

**The Amount of Additional Insurance.** The
amount of additional life insurance which may
be purchased on each Option Date shall be
equal to 5% of the Specified Amount of the
policy that is then currently in effect.

If an option is exercised, the daily and the
maximum benefits provided by the
Convalescent Care Benefits Riders attached to
the policy, will also be concurrently increased
by 5% of the amounts then currently in effect.

Exercising an option will not increase the death
benefit payable under any term rider attached
to the policy.

**Option Dates.** Every policy anniversary shall
be an Option Date as long as you have
exercised your right to purchase the additional
insurance on the previous Option Date. The
Option Dates, and your right to purchase
additional insurance under this rider, cease on
the earliest of the following dates or events:

a. The first Option Date on which you do not
purchase the additional insurance; or

b. The policy anniversary that falls on, or next
follows, the Insured's 85th birthday; or if
later, the 10th policy anniversary.

**Additional Premium.** We will require an
additional premium to be submitted for each
purchase of additional insurance. Premiums
for the additional insurance will be based upon
the Insured's attained age on the Option Date.
Premiums for benefits currently in force will not
be affected by your decision to purchase the
additional insurance.

**Notification.** At least 30 days before each
Option Date and while this rider is in force, we
will send you a written notice of the additional
insurance available on the next Option Date.
We will also advise you of the required
premium with and without the additional
insurance.

Your premium payment must be received by
us within 31 days after the Option Date. If you
accepted the additional insurance by sending
the additional premium, we will issue you a
new Policy Schedule showing your new
benefits. If we do not receive the required
additional premium within 31 days after the
Option Date, this rider will terminate.

If, however, the Insured was Chronically Ill
during the 31 day option period, then you may
still purchase this additional insurance by
submitting to us the required additional
premium no later than 5 months after the
Option Date. We will also require a statement
from the attending Physician certifying that the
Insured is Chronically Ill as defined under the
Convalescent Care Benefits Rider attached to
the policy.

**Consideration.** We issued this rider in



**FIRST PENN-PACIFIC LIFE INSURANCE CO.**
A part of LINCOLN NATIONAL CORPORATION

FORT WAYNE, INDIANA

Executive Office: 1801 South Meyers Road • Oakbrook Terrace, Illinois 60181-5214 • (630) 495-3336

We will pay the proceeds of this policy to the Beneficiary upon receipt of due proof of the Insured's death while this policy is in force and before the Maturity Date. We will pay the proceeds to the Owner on the Maturity Date if the Insured is living on that date. Payment is subject to the provisions, terms and conditions of this policy.

This policy is issued in consideration of the application and payment of the Initial Premium in advance.

**Right to Examine Policy. The policy may be returned, within 20 days after its receipt, to the insurance agent through whom it was purchased or to our Executive Office. If the policy is so returned, it will be deemed void from the Policy Date, and we will refund the premium paid.**

Signed for the Company at its Executive Office in Oakbrook Terrace, Illinois.

_Marcia L. DuMond_
Secretary

_[signature]_
President

**FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY**
**Adjustable Death Benefit**
Death Benefit payable at death prior to Maturity Date
Flexible premiums payable during the Insured's lifetime
until the Maturity Date.
Nonparticipating
**READ THIS POLICY CAREFULLY**

L-2020AA (11/87)